(Slip Opinion) OCTOBER TERM, 2014 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ZIVOTOFSKY, BY HIS PARENTS AND GUARDIANS, ZIVOTOFSKY ET UX. *v*. KERRY, SECRETARY OF STATE

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 13–628.   Argued November 3, 2014—Decided June 8, 2015

Petitioner Zivotofsky was born to United States citizens living in Jerusalem.  Pursuant to §214(d) of the Foreign Relations Authorization Act, Fiscal Year 2003, his mother asked American Embassy officials to list his place of birth as "Israel" on, *inter alia,* his passport.  Section 214(d) states for "purposes of the registration of birth, certification of nationality, or issuance of a passport of a United States citizen born in the city of Jerusalem, the Secretary shall, upon the request of the citizen or the citizen's legal guardian, record the place of birth as Israel."  The Embassy officials refused to list Zivotofsky's place of birth as "Israel" on his passport, citing the Executive Branch's longstanding position that the United States does not recognize any country as having sovereignty over Jerusalem.  Zivotofsky's parents brought suit on his behalf in federal court, seeking to enforce §214(d).  Ultimately, the D. C. Circuit held the statute unconstitutional, concluding that it contradicts the Executive Branch's exclusive power to recognize foreign sovereigns.

*Held*:

  1. The President has the exclusive power to grant formal recognition to a foreign sovereign.  Pp. 6–26.

    (a) Where, as here, the President's action is "incompatible with the expressed or implied will of Congress," the President "can rely [for his authority] only upon his own constitutional powers minus any constitutional powers of Congress over the matter," *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 637 (Jackson, J., concurring).  His asserted power must be both "exclusive" and "conclusive" on the issue, *id.,* at 637–638, and he may rely solely on powers the Constitution grants to him alone, *id.*, at 638.  To determine whether

the President's power of recognition is exclusive, this Court examines the Constitution's text and structure and relevant precedent and history. Pp. 6–7.

(b) The Constitution's text and structure grant the President the power to recognize foreign nations and governments. The Reception Clause directs that the President "shall receive Ambassadors and other public Ministers," Art. II, §3. And at the time of the founding, receiving an ambassador was considered tantamount to recognizing the sending state's sovereignty. It is thus logical and proper to infer that the Reception Clause would be understood to acknowledge the President's power to recognize other nations. This inference is further supported by the President's additional Article II powers: to negotiate treaties and to nominate the Nation's ambassadors and dispatch other diplomatic agents. Though ratifying a treaty and confirming an ambassador require congressional approval, Congress lacks authority to initiate the actions without the President's involvement. The President, unlike Congress, also has the power to open diplomatic channels simply by engaging in direct diplomacy with foreign heads of state and their ministers. The Constitution thus assigns the President, not Congress, means to effect recognition on his own initiative.

Functional considerations also suggest that the President's recognition power is exclusive. The Nation must "speak . . . with one voice" regarding which governments are legitimate in the eyes of the United States and which are not, *American Insurance Assn.* v. *Garamendi*, 539 U. S. 396, 424, and only the Executive has the characteristic of unity at all times. Unlike Congress, the President is also capable of engaging in the delicate and often secret diplomatic contacts that may lead to a recognition decision, see, *e.g., United States* v. *Pink*, 315 U. S. 203, 229, and is better positioned to take the decisive, unequivocal action necessary to recognize other states at international law. The President has also exercised unilateral recognition power since the founding, a practice endorsed by this Court, see, *e.g., Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398, 410.

Under basic separation-of-powers principles, Congress, which has the central role in making laws, see Art. I, §8, cl. 18, does have substantial authority regarding many policy determinations that precede and follow an act of recognition. The President's recognition determination is thus only one part of a political process. Pp. 7–14.

(b) A fair reading of relevant precedent illustrates that this Court has long considered recognition to be the exclusive prerogative of the Executive. See, *e.g., Williams* v. *Suffolk Ins. Co.*, 13 Pet. 415, 420; *United States* v. *Belmont,* 301 U. S. 324, 330; *United States* v. *Pink, supra,* at 229; *Banco Nacional de Cuba* v. *Sabbatino, supra,* at

Syllabus

410; *National City Bank of N. Y.* v. *Republic of China*, 348 U. S. 356, 358. *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 320, does not support a broader definition of the Executive's power over foreign relations that would permit the President alone to determine the whole content of the Nation's foreign policy. The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue. See, *e.g.*, *Medellín* v. *Texas*, 552 U. S. 491, 523–532. Nonetheless, it is for the President alone to make the specific decision of what foreign power he will recognize as legitimate, and his position must be clear. Pp. 14–20.

   (c) The weight of historical evidence also indicates Congress has accepted that the recognition power is exclusive to the Presidency. Cf. *NLRB* v. *Noel Canning*, 573 U. S. ___. Since the first Administration, the President has claimed unilateral authority to recognize foreign sovereigns. And Congress, for the most part, has acquiesced, generally respecting the Executive's policies and positions on formal recognition and even defending the President's constitutional prerogative. Pp. 20–26.

   2. Because the power to recognize foreign states resides in the President alone, §214(d) infringes on the Executive's consistent decision to withhold recognition with respect to Jerusalem. See *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 443. The provision forces the President, through the Secretary of State, to identify, upon request, citizens born in Jerusalem as being born in Israel when, as a matter of United States policy, neither Israel nor any other country is acknowledged as having sovereignty over Jerusalem.

   If the recognition power is to mean anything, it must mean that the President not only makes the initial, formal recognition determination but also may maintain that determination in his and his agent's statements. Under international law, recognition may be effected by written or oral declaration. In addition, an act of recognition must leave no doubt as to the intention to grant it. Thus, if Congress could alter the President's statements on matters of recognition or force him to contradict them, Congress in effect would exercise the recognition power. An "exclusive" Presidential power "disabl[es] the Congress from acting upon the subject." *Youngstown, supra*, at 638 (Jackson, J., concurring). If Congress may not pass a law, speaking in its own voice, effecting formal recognition, then it may not force the President, through §214(d), to contradict his prior recognition determination in an official document issued by the Secretary of State. See *Urtetiqui* v. *D'Arcy*, 9 Pet. 692, 698.

   Section 214(d)'s flaw is further underscored by the fact that the statute's purpose was to infringe on the President's exclusive recognition power. While Congress may have power to enact passport legis-

Syllabus

lation of wide scope, it may not "aggrandiz[e] its power at the expense
of another branch" by requiring the President to contradict an earlier
recognition determination in an official Executive Branch document.
*Freytag* v. *Commissioner*, 501 U. S. 868, 878.  Pp. 26–29.

725 F. 3d 197, affirmed.

KENNEDY, J., delivered the opinion of the Court, in which GINSBURG,
BREYER, SOTOMAYOR, and KAGAN, JJ., joined.  BREYER, J., filed a concur-
ring opinion.  THOMAS, J., filed an opinion concurring in the judgment
in part and dissenting in part.  ROBERTS, C. J., filed a dissenting opin-
ion, in which ALITO, J., joined.  SCALIA, J., filed a dissenting opinion, in
which ROBERTS, C. J., and ALITO, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

### No. 13–628

## MENACHEM BINYAMIN ZIVOTOFSKY, BY HIS PARENTS AND GUARDIANS, ARI Z. AND NAOMI SIEGMAN ZIVOTOFSKY, PETITIONER *v.* JOHN KERRY, SECRETARY OF STATE

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

### [June 8, 2015]

JUSTICE KENNEDY delivered the opinion of the Court.

A delicate subject lies in the background of this case. That subject is Jerusalem. Questions touching upon the history of the ancient city and its present legal and international status are among the most difficult and complex in international affairs. In our constitutional system these matters are committed to the Legislature and the Executive, not the Judiciary. As a result, in this opinion the Court does no more, and must do no more, than note the existence of international debate and tensions respecting Jerusalem. Those matters are for Congress and the President to discuss and consider as they seek to shape the Nation's foreign policies.

The Court addresses two questions to resolve the interbranch dispute now before it. First, it must determine whether the President has the exclusive power to grant formal recognition to a foreign sovereign. Second, if he has that power, the Court must determine whether Congress can command the President and his Secretary of

State to issue a formal statement that contradicts the earlier recognition. The statement in question here is a congressional mandate that allows a United States citizen born in Jerusalem to direct the President and Secretary of State, when issuing his passport, to state that his place of birth is "Israel."

I

A

Jerusalem's political standing has long been, and remains, one of the most sensitive issues in American foreign policy, and indeed it is one of the most delicate issues in current international affairs. In 1948, President Truman formally recognized Israel in a signed statement of "recognition." See Statement by the President Announcing Recognition of the State of Israel, Public Papers of the Presidents, May 14, 1948, p. 258 (1964). That statement did not recognize Israeli sovereignty over Jerusalem. Over the last 60 years, various actors have sought to assert full or partial sovereignty over the city, including Israel, Jordan, and the Palestinians. Yet, in contrast to a consistent policy of formal recognition of Israel, neither President Truman nor any later United States President has issued an official statement or declaration acknowledging any country's sovereignty over Jerusalem. Instead, the Executive Branch has maintained that "'the status of Jerusalem . . . should be decided not unilaterally but in consultation with all concerned.'" United Nations Gen. Assembly Official Records, 5th Emergency Sess., 1554th Plenary Meetings, United Nations Doc. No. 1 A⁄PV.1554, p. 10 (July 14, 1967); see, *e.g.,* Remarks by President Obama in Address to the United Nations Gen. Assembly (Sept. 21, 2011), 2011 Daily Comp. of Pres. Doc. No. 00661, p. 4 ("Ultimately, it is the Israelis and the Palestinians, not us, who must reach agreement on the issues that divide them," including "Jerusalem"). In a letter to Congress

then-Secretary of State Warren Christopher expressed the Executive's concern that "[t]here is no issue related to the Arab-Israeli negotiations that is more sensitive than Jerusalem." See 141 Cong. Rec. 28967 (1995) (letter to Robert Dole, Majority Leader, (June 20, 1995)). He further noted the Executive's opinion that "any effort . . . to bring it to the forefront" could be "very damaging to the success of the peace process." *Ibid.*

The President's position on Jerusalem is reflected in State Department policy regarding passports and consular reports of birth abroad. Understanding that passports will be construed as reflections of American policy, the State Department's Foreign Affairs Manual instructs its employees, in general, to record the place of birth on a passport as the "country [having] present sovereignty over the actual area of birth." Dept. of State, 7 Foreign Affairs Manual (FAM) §1383.4 (1987). If a citizen objects to the country listed as sovereign by the State Department, he or she may list the city or town of birth rather than the country. See *id.*, §1383.6. The FAM, however, does not allow citizens to list a sovereign that conflicts with Executive Branch policy. See generally *id.*, §1383. Because the United States does not recognize any country as having sovereignty over Jerusalem, the FAM instructs employees to record the place of birth for citizens born there as "Jerusalem." *Id.*, §1383.5–6 (emphasis deleted).

In 2002, Congress passed the Act at issue here, the Foreign Relations Authorization Act, Fiscal Year 2003, 116 Stat. 1350. Section 214 of the Act is titled "United States Policy with Respect to Jerusalem as the Capital of Israel." *Id.*, at 1365. The subsection that lies at the heart of this case, §214(d), addresses passports. That subsection seeks to override the FAM by allowing citizens born in Jerusalem to list their place of birth as "Israel." Titled "Record of Place of Birth as Israel for Passport Purposes," §214(d) states "[f]or purposes of the registration of birth,

certification of nationality, or issuance of a passport of a United States citizen born in the city of Jerusalem, the Secretary shall, upon the request of the citizen or the citizen's legal guardian, record the place of birth as Israel." *Id.*, at 1366.

When he signed the Act into law, President George W. Bush issued a statement declaring his position that §214 would, "if construed as mandatory rather than advisory, impermissibly interfere with the President's constitutional authority to formulate the position of the United States, speak for the Nation in international affairs, and determine the terms on which recognition is given to foreign states." Statement on Signing the Foreign Relations Authorization Act, Fiscal Year 2003, Public Papers of the Presidents, George W. Bush, Vol. 2, Sept. 30, 2002, p. 1698 (2005). The President concluded, "U. S. policy regarding Jerusalem has not changed." *Ibid.*

Some parties were not reassured by the President's statement. A cable from the United States Consulate in Jerusalem noted that the Palestine Liberation Organization Executive Committee, Fatah Central Committee, and the Palestinian Authority Cabinet had all issued statements claiming that the Act "'undermines the role of the U. S. as a sponsor of the peace process.'" App. 231. In the Gaza Strip and elsewhere residents marched in protest. See The Associated Press and Reuters, Palestinians Stone Police Guarding Western Wall, The Seattle Times, Oct. 5, 2002, p. A7.

In response the Secretary of State advised diplomats to express their understanding of "Jerusalem's importance to both sides and to many others around the world." App. 228. He noted his belief that America's "policy towards Jerusalem" had not changed. *Ibid.*

## B

In 2002, petitioner Menachem Binyamin Zivotofsky was

born to United States citizens living in Jerusalem. App. 24–25. In December 2002, Zivotofsky's mother visited the American Embassy in Tel Aviv to request both a passport and a consular report of birth abroad for her son. *Id.,* at 25. She asked that his place of birth be listed as "'Jerusalem, Israel.'" *Ibid.* The Embassy clerks explained that, pursuant to State Department policy, the passport would list only "Jerusalem." *Ibid.* Zivotofsky's parents objected and, as his guardians, brought suit on his behalf in the United States District Court for the District of Columbia, seeking to enforce §214(d).

Pursuant to §214(d), Zivotofsky claims the right to have "Israel" recorded as his place of birth in his passport. See *Zivotofsky* v. *Clinton*, 566 U. S. \_\_\_, \_\_\_ (2012) (slip op., at 4) ("[W]hile Zivotofsky had originally asked that 'Jerusalem, Israel' be recorded on his passport, '[b]oth sides agree that the question now is whether §214(d) entitles [him] to have just 'Israel' listed' "). The arguments in Zivotofsky's brief center on his passport claim, as opposed to the consular report of birth abroad. Indeed, in the court below, Zivotofsky waived any argument that his consular report of birth abroad should be treated differently than his passport. *Zivotofsky* v. *Secretary of State*, 725 F. 3d 197, 203, n. 3 (CADC 2013). He has also waived the issue here by failing to differentiate between the two documents. As a result, the Court addresses Zivotofsky's passport arguments and need not engage in a separate analysis of the validity of §214(d) as applied to consular reports of birth abroad.

After Zivotofsky brought suit, the District Court dismissed his case, reasoning that it presented a nonjusticiable political question and that Zivotofsky lacked standing. App. 28–39. The Court of Appeals for the District of Columbia Circuit reversed on the standing issue, *Zivotofsky* v. *Secretary of State,* 444 F. 3d 614, 617–619 (2006), but later affirmed the District Court's political question de-

termination.  See *Zivotofsky* v. *Secretary of State*, 571 F. 3d 1227, 1228 (2009).

This Court granted certiorari, vacated the judgment, and remanded the case.  Whether §214(d) is constitutional, the Court held, is not a question reserved for the political branches.  In reference to Zivotofsky's claim the Court observed "the Judiciary must decide if Zivotofsky's interpretation of the statute is correct, and whether the statute is constitutional"—not whether Jerusalem is, in fact, part of Israel.  *Zivotofsky* v. *Clinton*, *supra*, at___ (slip op., at 7).

On remand the Court of Appeals held the statute unconstitutional.  It determined that "the President exclusively holds the power to determine whether to recognize a foreign sovereign," 725 F. 3d, at 214, and that "section 214(d) directly contradicts a carefully considered exercise of the Executive branch's recognition power." *Id.*, at 217.

This Court again granted certiorari.  572 U. S. ___ (2014).

## II

In considering claims of Presidential power this Court refers to Justice Jackson's familiar tripartite framework from *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 635–638 (1952) (concurring opinion).  The framework divides exercises of Presidential power into three categories: First, when "the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Id.*, at 635.  Second, "in absence of either a congressional grant or denial of authority" there is a "zone of twilight in which he and Congress may have concurrent authority," and where "congressional inertia, indifference or quiescence may" invite the exercise of executive power. *Id.*, at 637.  Finally, when "the President takes measures incompatible with the expressed or implied will of Congress . . . he can rely

only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Ibid.* To succeed in this third category, the President's asserted power must be both "exclusive" and "conclusive" on the issue. *Id.,* at 637–638.

In this case the Secretary contends that §214(d) infringes on the President's exclusive recognition power by "requiring the President to contradict his recognition position regarding Jerusalem in official communications with foreign sovereigns." Brief for Respondent 48. In so doing the Secretary acknowledges the President's power is "at its lowest ebb." *Youngstown*, 343 U. S., at 637. Because the President's refusal to implement §214(d) falls into Justice Jackson's third category, his claim must be "scrutinized with caution," and he may rely solely on powers the Constitution grants to him alone. *Id.*, at 638.

To determine whether the President possesses the exclusive power of recognition the Court examines the Constitution's text and structure, as well as precedent and history bearing on the question.

## A

Recognition is a "formal acknowledgement" that a particular "entity possesses the qualifications for statehood" or "that a particular regime is the effective government of a state." Restatement (Third) of Foreign Relations Law of the United States §203, Comment *a*, p. 84 (1986). It may also involve the determination of a state's territorial bounds. See 2 M. Whiteman, Digest of International Law §1, p. 1 (1963) (Whiteman) ("[S]tates may recognize or decline to recognize territory as belonging to, or under the sovereignty of, or having been acquired or lost by, other states"). Recognition is often effected by an express "written or oral declaration." 1 J. Moore, Digest of International Law §27, p. 73 (1906) (Moore). It may also be implied— for example, by concluding a bilateral treaty or by sending

or receiving diplomatic agents. *Ibid*.; I. Brownlie, Principles of Public International Law 93 (7th ed. 2008) (Brownlie).

Legal consequences follow formal recognition. Recognized sovereigns may sue in United States courts, see *Guaranty Trust Co.* v. *United States*, 304 U. S. 126, 137 (1938), and may benefit from sovereign immunity when they are sued, see *National City Bank of N. Y.* v. *Republic of China*, 348 U. S. 356, 358–359 (1955). The actions of a recognized sovereign committed within its own territory also receive deference in domestic courts under the act of state doctrine. See *Oetjen* v. *Central Leather Co.*, 246 U. S. 297, 302–303 (1918). Recognition at international law, furthermore, is a precondition of regular diplomatic relations. 1 Moore §27, at 72. Recognition is thus "useful, even necessary," to the existence of a state. *Ibid.*

Despite the importance of the recognition power in foreign relations, the Constitution does not use the term "recognition," either in Article II or elsewhere. The Secretary asserts that the President exercises the recognition power based on the Reception Clause, which directs that the President "shall receive Ambassadors and other public Ministers." Art. II, §3. As Zivotofsky notes, the Reception Clause received little attention at the Constitutional Convention. See Reinstein, Recognition: A Case Study on the Original Understanding of Executive Power, 45 U. Rich. L. Rev. 801, 860–862 (2011). In fact, during the ratification debates, Alexander Hamilton claimed that the power to receive ambassadors was "more a matter of dignity than of authority," a ministerial duty largely "without consequence." The Federalist No. 69, p. 420 (C. Rossiter ed. 1961).

At the time of the founding, however, prominent international scholars suggested that receiving an ambassador was tantamount to recognizing the sovereignty of the sending state. See E. de Vattel, The Law of Nations §78,

p. 461 (1758) (J. Chitty ed. 1853) ("[E]very state, truly possessed of sovereignty, has a right to send ambassadors" and "to contest their right in this instance" is equivalent to "contesting their sovereign dignity"); see also 2 C. van Bynkershoek, On Questions of Public Law 156–157 (1737) (T. Frank ed. 1930) ("Among writers on public law it is usually agreed that only a sovereign power has a right to send ambassadors"); 2 H. Grotius, On the Law of War and Peace 440–441 (1625) (F. Kelsey ed. 1925) (discussing the duty to admit ambassadors of sovereign powers). It is a logical and proper inference, then, that a Clause directing the President alone to receive ambassadors would be understood to acknowledge his power to recognize other nations.

This in fact occurred early in the Nation's history when President Washington recognized the French Revolutionary Government by receiving its ambassador. See A. Hamilton, Pacificus No. 1, in The Letters of Pacificus and Helvidius 5, 13–14 (1845) (reprint 1976) (President "acknowledged the republic of France, by the reception of its minister"). After this incident the import of the Reception Clause became clear—causing Hamilton to change his earlier view. He wrote that the Reception Clause "includes th[e power] of judging, in the case of a revolution of government in a foreign country, whether the new rulers are competent organs of the national will, and ought to be recognised, or not." See *id.*, at 12; see also 3 J. Story, Commentaries on the Constitution of the United States §1560, p. 416 (1833) ("If the executive receives an ambassador, or other minister, as the representative of a new nation . . . it is an acknowledgment of the sovereign authority *de facto* of such new nation, or party"). As a result, the Reception Clause provides support, although not the sole authority, for the President's power to recognize other nations.

The inference that the President exercises the recogni-

tion power is further supported by his additional Article II powers. It is for the President, "by and with the Advice and Consent of the Senate," to "make Treaties, provided two thirds of the Senators present concur." Art. II, §2, cl. 2. In addition, "he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors" as well as "other public Ministers and Consuls." *Ibid.*

As a matter of constitutional structure, these additional powers give the President control over recognition decisions. At international law, recognition may be effected by different means, but each means is dependent upon Presidential power. In addition to receiving an ambassador, recognition may occur on "the conclusion of a bilateral treaty," or the "formal initiation of diplomatic relations," including the dispatch of an ambassador. Brownlie 93; see also 1 Moore §27, at 73. The President has the sole power to negotiate treaties, see *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 319 (1936), and the Senate may not conclude or ratify a treaty without Presidential action. The President, too, nominates the Nation's ambassadors and dispatches other diplomatic agents. Congress may not send an ambassador without his involvement. Beyond that, the President himself has the power to open diplomatic channels simply by engaging in direct diplomacy with foreign heads of state and their ministers. The Constitution thus assigns the President means to effect recognition on his own initiative. Congress, by contrast, has no constitutional power that would enable it to initiate diplomatic relations with a foreign nation. Because these specific Clauses confer the recognition power on the President, the Court need not consider whether or to what extent the Vesting Clause, which provides that the "executive Power" shall be vested in the President, provides further support for the President's action here. Art. II, §1, cl. 1.

The text and structure of the Constitution grant the President the power to recognize foreign nations and governments. The question then becomes whether that power is exclusive. The various ways in which the President may unilaterally effect recognition—and the lack of any similar power vested in Congress—suggest that it is. So, too, do functional considerations. Put simply, the Nation must have a single policy regarding which governments are legitimate in the eyes of the United States and which are not. Foreign countries need to know, before entering into diplomatic relations or commerce with the United States, whether their ambassadors will be received; whether their officials will be immune from suit in federal court; and whether they may initiate lawsuits here to vindicate their rights. These assurances cannot be equivocal.

Recognition is a topic on which the Nation must "'speak . . . with one voice.'" *American Ins. Assn.* v. *Garamendi*, 539 U. S. 396, 424 (2003) (quoting *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 381 (2000)). That voice must be the President's. Between the two political branches, only the Executive has the characteristic of unity at all times. And with unity comes the ability to exercise, to a greater degree, "[d]ecision, activity, secrecy, and dispatch." The Federalist No. 70, p. 424 (A. Hamilton). The President is capable, in ways Congress is not, of engaging in the delicate and often secret diplomatic contacts that may lead to a decision on recognition. See, *e.g., United States* v. *Pink*, 315 U. S. 203, 229 (1942). He is also better positioned to take the decisive, unequivocal action necessary to recognize other states at international law. 1 Oppenheim's International Law §50, p. 169 (R. Jennings & A. Watts eds., 9th ed. 1992) (act of recognition must "leave no doubt as to the intention to grant it"). These qualities explain why the Framers listed the traditional avenues of recognition—receiving ambassadors,

making treaties, and sending ambassadors—as among the
President's Article II powers.

As described in more detail below, the President since
the founding has exercised this unilateral power to recog-
nize new states—and the Court has endorsed the practice.
See *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398,
410 (1964); *Pink*, *supra,* at 229; *Williams* v. *Suffolk Ins.
Co.*, 13 Pet. 415, 420 (1839). Texts and treatises on inter-
national law treat the President's word as the final word
on recognition. See, *e.g.*, Restatement (Third) of Foreign
Relations Law §204, at 89 ("Under the Constitution of the
United States the President has exclusive authority to
recognize or not to recognize a foreign state or govern-
ment"); see also L. Henkin, Foreign Affairs and the U. S.
Constitution 43 (2d ed. 1996) ("It is no longer questioned
that the President does not merely perform the ceremony
of receiving foreign ambassadors but also determines
whether the United States should recognize or refuse to
recognize a foreign government"). In light of this author-
ity all six judges who considered this case in the Court of
Appeals agreed that the President holds the exclusive
recognition power. See 725 F. 3d, at 214 ("[W]e conclude
that the President exclusively holds the power to deter-
mine whether to recognize a foreign sovereign"); *Zivo-
tofsky*, 571 F. 3d, at 1231 ("That this power belongs solely
to the President has been clear from the earliest days of
the Republic"); *id.,* at 1240 (Edwards, J., concurring) ("The
Executive has exclusive and unreviewable authority to
recognize foreign sovereigns").

It remains true, of course, that many decisions affecting
foreign relations—including decisions that may determine
the course of our relations with recognized countries—
require congressional action. Congress may "regulate
Commerce with foreign Nations," "establish an uniform
Rule of Naturalization," "define and punish Piracies and
Felonies committed on the high Seas, and Offences against

the Law of Nations," "declare War," "grant Letters of Marque and Reprisal," and "make Rules for the Government and Regulation of the land and naval Forces." U. S. Const., Art. I, §8. In addition, the President cannot make a treaty or appoint an ambassador without the approval of the Senate. Art. II, §2, cl. 2. The President, furthermore, could not build an American Embassy abroad without congressional appropriation of the necessary funds. Art. I, §8, cl. 1. Under basic separation-of-powers principles, it is for the Congress to enact the laws, including "all Laws which shall be necessary and proper for carrying into Execution" the powers of the Federal Government. §8, cl. 18.

In foreign affairs, as in the domestic realm, the Constitution "enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown*, 343 U. S., at 635 (Jackson, J., concurring). Although the President alone effects the formal act of recognition, Congress' powers, and its central role in making laws, give it substantial authority regarding many of the policy determinations that precede and follow the act of recognition itself. If Congress disagrees with the President's recognition policy, there may be consequences. Formal recognition may seem a hollow act if it is not accompanied by the dispatch of an ambassador, the easing of trade restrictions, and the conclusion of treaties. And those decisions require action by the Senate or the whole Congress.

In practice, then, the President's recognition determination is just one part of a political process that may require Congress to make laws. The President's exclusive recognition power encompasses the authority to acknowledge, in a formal sense, the legitimacy of other states and governments, including their territorial bounds. Albeit limited, the exclusive recognition power is essential to the conduct of Presidential duties. The formal act of recognition is an executive power that Congress may not qualify. If the

President is to be effective in negotiations over a formal recognition determination, it must be evident to his counterparts abroad that he speaks for the Nation on that precise question.

A clear rule that the formal power to recognize a foreign government subsists in the President therefore serves a necessary purpose in diplomatic relations. All this, of course, underscores that Congress has an important role in other aspects of foreign policy, and the President may be bound by any number of laws Congress enacts. In this way ambition counters ambition, ensuring that the democratic will of the people is observed and respected in foreign affairs as in the domestic realm. See The Federalist No. 51, p. 322 (J. Madison).

## B

No single precedent resolves the question whether the President has exclusive recognition authority and, if so, how far that power extends. In part that is because, until today, the political branches have resolved their disputes over questions of recognition. The relevant cases, though providing important instruction, address the division of recognition power between the Federal Government and the States, see, *e.g., Pink*, 315 U. S. 203, or between the courts and the political branches, see, *e.g., Banco Nacional de Cuba*, 376 U. S., at 410—not between the President and Congress. As the parties acknowledge, some isolated statements in those cases lend support to the position that Congress has a role in the recognition process. In the end, however, a fair reading of the cases shows that the President's role in the recognition process is both central and exclusive.

During the administration of President Van Buren, in a case involving a dispute over the status of the Falkland Islands, the Court noted that "when the executive branch of the government" assumes "a fact in regard to the sover-

eignty of any island or country, it is conclusive on the judicial department." *Williams*, 13 Pet., at 420. Once the President has made his determination, it "is enough to know, that in the exercise of his constitutional functions, he has decided the question. Having done this under the responsibilities which belong to him, it is obligatory on the people and government of the Union." *Ibid.*

Later, during the 1930's and 1940's, the Court addressed issues surrounding President Roosevelt's decision to recognize the Soviet Government of Russia. In *United States* v. *Belmont,* 301 U. S. 324 (1937), and *Pink,* 315 U. S. 203, New York state courts declined to give full effect to the terms of executive agreements the President had concluded in negotiations over recognition of the Soviet regime. In particular the state courts, based on New York public policy, did not treat assets that had been seized by the Soviet Government as property of Russia and declined to turn those assets over to the United States. The Court stated that it "may not be doubted" that "recognition, establishment of diplomatic relations, . . . and agreements with respect thereto" are "within the competence of the President." *Belmont*, 301 U. S., at 330. In these matters, "the Executive ha[s] authority to speak as the sole organ of th[e] government." *Ibid.* The Court added that the President's authority "is not limited to a determination of the government to be recognized. It includes the power to determine the policy which is to govern the question of recognition." *Pink, supra,* at 229; see also *Guaranty Trust Co.,* 304 U. S., at 137–138 (The "political department['s] . . . action in recognizing a foreign government and in receiving its diplomatic representatives is conclusive on all domestic courts"). Thus, New York state courts were required to respect the executive agreements.

It is true, of course, that *Belmont* and *Pink* are not direct holdings that the recognition power is exclusive. Those cases considered the validity of executive agree-

ments, not the initial act of recognition. The President's determination in those cases did not contradict an Act of Congress. And the primary issue was whether the executive agreements could supersede state law. Still, the language in *Pink* and *Belmont*, which confirms the President's competence to determine questions of recognition, is strong support for the conclusion that it is for the President alone to determine which foreign governments are legitimate.

*Banco Nacional de Cuba* contains even stronger statements regarding the President's authority over recognition. There, the status of Cuba's Government and its acts as a sovereign were at issue. As the Court explained, "Political recognition is exclusively a function of the Executive." 376 U. S., at 410. Because the Executive had recognized the Cuban Government, the Court held that it should be treated as sovereign and could benefit from the "act of state" doctrine. See also *Baker* v. *Carr*, 369 U. S. 186, 213 (1962) ("[I]t is the executive that determines a person's status as representative of a foreign government"); *National City Bank of N. Y.*, 348 U. S., at 358 ("The status of the Republic of China in our courts is a matter for determination by the Executive and is outside the competence of this Court"). As these cases illustrate, the Court has long considered recognition to be the exclusive prerogative of the Executive.

The Secretary now urges the Court to define the executive power over foreign relations in even broader terms. He contends that under the Court's precedent the President has "exclusive authority to conduct diplomatic relations," along with "the bulk of foreign-affairs powers." Brief for Respondent 18, 16. In support of his submission that the President has broad, undefined powers over foreign affairs, the Secretary quotes *United States* v. *Curtiss-Wright Export Corp.*, which described the President as "the sole organ of the federal government in the

field of international relations." 299 U. S., at 320. This Court declines to acknowledge that unbounded power. A formulation broader than the rule that the President alone determines what nations to formally recognize as legitimate—and that he consequently controls his statements on matters of recognition—presents different issues and is unnecessary to the resolution of this case.

The *Curtiss-Wright* case does not extend so far as the Secretary suggests. In *Curtiss-Wright*, the Court considered whether a congressional delegation of power to the President was constitutional. Congress had passed a joint resolution giving the President the discretion to prohibit arms sales to certain militant powers in South America. The resolution provided criminal penalties for violation of those orders. *Id.,* at 311–312. The Court held that the delegation was constitutional, reasoning that Congress may grant the President substantial authority and discretion in the field of foreign affairs. *Id.,* at 315–329. Describing why such broad delegation may be appropriate, the opinion stated:

> "In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation. He *makes* treaties with the advice and consent of the Senate; but he alone negotiates. Into the field of negotiation the Senate cannot intrude; and Congress itself is powerless to invade it. As Marshall said in his great argument of March 7, 1800, in the House of Representatives, 'The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations.' [10 Annals of Cong.] 613. " *Id.,* at 319.

This description of the President's exclusive power was not necessary to the holding of *Curtiss-Wright*—which, after all, dealt with congressionally authorized action, not

a unilateral Presidential determination. Indeed, *Curtiss-Wright* did not hold that the President is free from Congress' lawmaking power in the field of international relations. The President does have a unique role in communicating with foreign governments, as then-Congressman John Marshall acknowledged. See 10 Annals of Cong. 613 (1800) (cited in *Curtiss-Wright, supra,* at 319). But whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law.

In a world that is ever more compressed and interdependent, it is essential the congressional role in foreign affairs be understood and respected. For it is Congress that makes laws, and in countless ways its laws will and should shape the Nation's course. The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue. See, *e.g.*, *Medellín* v. *Texas*, 552 U. S. 491, 523–532 (2008); *Youngstown*, 343 U. S., at 589; *Little* v. *Barreme*, 2 Cranch 170, 177–179 (1804); Glennon, Two Views of Presidential Foreign Affairs Power: *Little* v. *Barreme* or *Curtiss-Wright*? 13 Yale J. Int'l L. 5, 19–20 (1988); cf. *Dames & Moore* v. *Regan*, 453 U. S. 654, 680–681 (1981). It is not for the President alone to determine the whole content of the Nation's foreign policy.

That said, judicial precedent and historical practice teach that it is for the President alone to make the specific decision of what foreign power he will recognize as legitimate, both for the Nation as a whole and for the purpose of making his own position clear within the context of recognition in discussions and negotiations with foreign nations. Recognition is an act with immediate and powerful significance for international relations, so the President's position must be clear. Congress cannot require him to contradict his own statement regarding a determination of formal recognition.

Zivotofsky's contrary arguments are unconvincing.  The decisions he relies upon are largely inapposite.  This Court's cases do not hold that the recognition power is shared.  *Jones* v. *United States*, 137 U. S. 202 (1890), and *Boumediene* v. *Bush*, 553 U. S. 723 (2008), each addressed the status of territories controlled or acquired by the United States—not whether a province ought to be recognized as part of a foreign country.  See also *Vermilya-Brown Co.* v. *Connell*, 335 U. S. 377, 380 (1948) ("[D]etermination of [American] sovereignty over an area is for the legislative and executive departments").  And no one disputes that Congress has a role in determining the status of United States territories.  See U. S. Const., Art. IV, §3, cl. 2 (Congress may "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States").  Other cases describing a shared power address the recognition of Indian tribes—which is, similarly, a distinct issue from the recognition of foreign countries.  See *Cherokee Nation* v. *Georgia*, 5 Pet. 1 (1831).

To be sure, the Court has mentioned both of the political branches in discussing international recognition, but it has done so primarily in affirming that the Judiciary is not responsible for recognizing foreign nations.  See *Oetjen*, 246 U. S., at 302 ("'Who is the sovereign, *de jure* or *de facto*, of a territory is not a judicial, but is a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges'" (quoting *Jones*, *supra,* at 212)); *United States* v. *Palmer*, 3 Wheat. 610, 643 (1818) ("[T]he courts of the union must view [a] newly constituted government as it is viewed by the legislative and executive departments of the government of the United States").  This is consistent with the fact that Congress, in the ordinary course, does support the President's recognition policy, for instance by confirming an ambassador to the recognized

foreign government.  Those cases do not cast doubt on the
view that the Executive Branch determines whether the
United States will recognize foreign states and govern-
ments and their territorial bounds.

C

Having examined the Constitution's text and this
Court's precedent, it is appropriate to turn to accepted
understandings and practice.  In separation-of-powers
cases this Court has often "put significant weight upon
historical practice."  *NLRB* v. *Noel Canning*, 573 U. S. ___,
___ (2014) (slip op., at 6) (emphasis deleted).  Here, history
is not all on one side, but on balance it provides strong
support for the conclusion that the recognition power is
the President's alone.  As Zivotofsky argues, certain his-
torical incidents can be interpreted to support the position
that recognition is a shared power.  But the weight of
historical evidence supports the opposite view, which is
that the formal determination of recognition is a power to
be exercised only by the President.

The briefs of the parties and *amici*, which have been of
considerable assistance to the Court, give a more complete
account of the relevant history, as do the works of scholars
in this field.  See, *e.g.,* Brief for Respondent 26–39; Brief
for Petitioner 34–57; Brief for American Jewish Commit-
tee as *Amicus Curiae* 6–24; J. Goebel, The Recognition
Policy of the United States 97–170 (1915) (Goebel); 1
Moore §§28–58, 74–164; Reinstein, Is the President's
Recognition Power Exclusive? 86 Temp. L. Rev. 1, 3–50
(2013).  But even a brief survey of the major historical
examples, with an emphasis on those said to favor Zivo-
tofsky, establishes no more than that some Presidents
have chosen to cooperate with Congress, not that Congress
itself has exercised the recognition power.

From the first Administration forward, the President
has claimed unilateral authority to recognize foreign

sovereigns. For the most part, Congress has acquiesced in the Executive's exercise of the recognition power. On occasion, the President has chosen, as may often be prudent, to consult and coordinate with Congress. As Judge Tatel noted in this case, however, "the most striking thing" about the history of recognition "is what is absent from it: a situation like this one," where Congress has enacted a statute contrary to the President's formal and considered statement concerning recognition. 725 F. 3d, at 221 (concurring opinion).

The first debate over the recognition power arose in 1793, after France had been torn by revolution. See Prakash & Ramsey, The Executive Power over Foreign Affairs, 111 Yale L. J. 231, 312 (2001). Once the Revolutionary Government was established, Secretary of State Jefferson and President Washington, without consulting Congress, authorized the American Ambassador to resume relations with the new regime. See Letter to Gouverneur Morris (Mar. 12, 1793), in 25 Papers of Thomas Jefferson 367, 367–368 (J. Catanzariti ed. 1992); Goebel 99–104. Soon thereafter, the new French Government proposed to send an ambassador, Citizen Genet, to the United States. See *id.,* at 105. Members of the President's Cabinet agreed that receiving Genet would be a binding and public act of recognition. See Opinion on the Treaties with France (Apr. 28, 1793), in 25 Papers of Thomas Jefferson, at 608, 612 ("The reception of the Minister at all . . . is an ackno[w]le[d]gement of the legitimacy of their government"); see also Letter from A. Hamilton to G. Washington (Cabinet Paper) (Apr. 1793), in 4 Works of Alexander Hamilton 369, 369–396 (H. Lodge ed. 1904). They decided, however, both that Genet should be received and that consultation with Congress was not necessary. See T. Jefferson, Anas (Apr. 18, 1793), in 1 Writings of Thomas Jefferson 226, 227 (P. Ford ed. 1892); Cabinet Opinion on Washington's Questions on Neutrality and the Alliance

with France (Apr. 19, 1793), in 25 Papers of Thomas Jefferson, at 570. Congress expressed no disagreement with this position, and Genet's reception marked the Nation's first act of recognition—one made by the President alone. See Prakash, *supra*, at 312–313.

The recognition power again became relevant when yet another revolution took place—this time, in South America, as several colonies rose against Spain. In 1818, Speaker of the House Henry Clay announced he "intended moving the recognition of Buenos Ayres and probably of Chile." Goebel 121. Clay thus sought to appropriate money "'[f]or one year's salary'" for "'a Minister'" to present-day Argentina. 32 Annals of Cong. 1500 (1818). President Monroe, however, did not share that view. Although Clay gave "one of the most remarkable speeches of his career," his proposed bill was defeated. Goebel 123; 32 Annals of Cong. 1655. That action has been attributed, in part, to the fact that Congress agreed the recognition power rested solely with the President. Goebel 124; see, *e.g.,* 32 Annals of Cong. 1570 (statement of Rep. Alexander Smyth) ("[T]he acknowledgment of the independence of a new Power is an exercise of Executive authority; consequently, for Congress to direct the Executive how he shall exercise this power, is an act of usurpation"). Four years later, after the President had decided to recognize the South American republics, Congress did pass a resolution, on his request, appropriating funds for "such missions to the independent nations on the American continent, as the President of the United States may deem proper." Act of May 4, 1822, ch. 52, 3 Stat. 678.

A decade later, President Jackson faced a recognition crisis over Texas. In 1835, Texas rebelled against Mexico and formed its own government. See Goebel 144–147. But the President feared that recognizing the new government could ignite a war. See A. Jackson, To the Senate and House of Representatives of the United States (Dec.

21, 1836), in 3 Messages and Papers of the Presidents 265, 266–267 (J. Richardson ed. 1899). After Congress urged him to recognize Texas, see Cong. Globe, 24th Cong., 1st Sess., 453 (1836); H. R. Rep. No. 854, 24th Cong., 1st Sess. (1836), the President delivered a message to the Legislature. He concluded there had not been a "deliberate inquiry" into whether the President or Congress possessed the recognition power. See A. Jackson, in 3 Messages and Papers of the Presidents, at 267. He stated, however, "on the ground of expediency, I am disposed to concur" with Congress' preference regarding Texas. *Ibid.* In response Congress appropriated funds for a "diplomatic agent to be sent to the Republic of Texas, whenever the President of the United States . . . shall deem it expedient to appoint such minister." Act of Mar. 3, 1837, 5 Stat. 170. Thus, although he cooperated with Congress, the President was left to execute the formal act of recognition.

President Lincoln, too, sought to coordinate with Congress when he requested support for his recognition of Liberia and Haiti. In his first annual message to Congress he said he could see no reason "why we should persevere longer in withholding our recognition of the independence and sovereignty of Hayti and Liberia." Lincoln's First Annual Message to Congress (Dec. 3, 1861), in 6 Messages and Papers of the Presidents 44, 47. Nonetheless, he was "[u]nwilling" to "inaugurate a novel policy in regard to them without the approbation of Congress." *Ibid.* In response Congress concurred in the President's recognition determination and enacted a law appropriating funds to appoint diplomatic representatives to the two countries—leaving, as usual, the actual dispatch of ambassadors and formal statement of recognition to the President. Act of June 5, 1862, 12 Stat. 421.

Three decades later, the branches again were able to reach an accord, this time with regard to Cuba. In 1898, an insurgency against the Spanish colonial government

was raging in Cuba. President McKinley determined to ask Congress for authorization to send armed forces to Cuba to help quell the violence. See 31 Cong. Rec. 3699–3702 (1898). Although McKinley thought Spain was to blame for the strife, he opposed recognizing either Cuba or its insurgent government. *Id.*, at 3701. At first, the House proposed a resolution consistent with McKinley's wishes. *Id.*, at 3810. The Senate countered with a resolution that authorized the use of force but that did recognize both Cuban independence and the insurgent government. *Id.*, at 3993. When the Senate's version reached the House, the House again rejected the language recognizing Cuban independence. *Id.*, at 4017. The resolution went to Conference, which, after debate, reached a compromise. See Reinstein, 86 Temp. L. Rev., at 40–41. The final resolution stated "the people of the Island of Cuba are, and of right ought to be, free and independent," but made no mention of recognizing a new Cuban Government. Act of Apr. 20, 1898, 30 Stat. 738. Accepting the compromise, the President signed the joint resolution. See Reinstein, 86 Temp. L. Rev., at 41.

For the next 80 years, "[P]residents consistently recognized new states and governments without any serious opposition from, or activity in, Congress." *Ibid.*; see 2 Whiteman §§6–60, at 133–242 (detailing over 50 recognition decisions made by the Executive). The next debate over recognition did not occur until the late 1970's. It concerned China.

President Carter recognized the People's Republic of China (PRC) as the government of China, and derecognized the Republic of China, located on Taiwan. See S. Kan, Cong. Research Serv., China/Taiwan: Evolution of the "One China" Policy—Key Statements from Washington, Beijing, and Taipei 1, 10 (Oct. 10, 2014). As to the status of Taiwan, the President "acknowledge[d] the Chinese position" that "Taiwan is part of China," *id.,* at 39

(text of U. S.–PRC Joint Communique on the Establishment of Diplomatic Relations (Jan. 1, 1979)), but he did not accept that claim. The President proposed a new law defining how the United States would conduct business with Taiwan. See Hearings on Taiwan Legislation before the House Committee on Foreign Affairs, 96th Cong., 1st Sess., 2–6 (1979) (statement of Warren Christopher, Deputy Secretary of State). After extensive revisions, Congress passed, and the President signed, the Taiwan Relations Act, 93 Stat. 14 (1979) (codified as amended at 22 U. S. C. §§3301–3316). The Act (in a simplified summary) treated Taiwan as if it were a legally distinct entity from China— an entity with which the United States intended to maintain strong ties. See, *e.g.*, §§3301, 3303(a), (b)(1), (b)(7).

Throughout the legislative process, however, no one raised a serious question regarding the President's exclusive authority to recognize the PRC—or to decline to grant formal recognition to Taiwan. See, *e.g.*, 125 Cong. Rec. 6709 (1979) (statement of Sen. Jacob Javits) ("Neither bill [proposed by either Chamber] sought to reestablish official relations between the United States and the Republic of China on Taiwan; Congress . . . does not have the authority to do that even if it wanted to do so"). Rather, Congress accepted the President's recognition determination as a completed, lawful act; and it proceeded to outline the trade and policy provisions that, in its judgment, were appropriate in light of that decision.

This history confirms the Court's conclusion in the instant case that the power to recognize or decline to recognize a foreign state and its territorial bounds resides in the President alone. For the most part, Congress has respected the Executive's policies and positions as to formal recognition. At times, Congress itself has defended the President's constitutional prerogative. Over the last 100 years, there has been scarcely any debate over the President's power to recognize foreign states. In this

respect the Legislature, in the narrow context of recogni-
tion, on balance has acknowledged the importance of
speaking "with one voice." *Crosby*, 530 U. S., at 381. The
weight of historical evidence indicates Congress has ac-
cepted that the power to recognize foreign states and
governments and their territorial bounds is exclusive to
the Presidency.

### III

As the power to recognize foreign states resides in the
President alone, the question becomes whether §214(d)
infringes on the Executive's consistent decision to with-
hold recognition with respect to Jerusalem. See *Nixon* v.
*Administrator of General Services*, 433 U. S. 425, 443
(1977) (action unlawful when it "prevents the Executive
Branch from accomplishing its constitutionally assigned
functions").

Section 214(d) requires that, in a passport or consular
report of birth abroad, "the Secretary shall, upon the
request of the citizen or the citizen's legal guardian, record
the place of birth as Israel" for a "United States citizen
born in the city of Jerusalem." 116 Stat. 1366. That is,
§214(d) requires the President, through the Secretary, to
identify citizens born in Jerusalem who so request as
being born in Israel. But according to the President, those
citizens were not born in Israel. As a matter of United
States policy, neither Israel nor any other country is
acknowledged as having sovereignty over Jerusalem. In
this way, §214(d) "directly contradicts" the "carefully
calibrated and longstanding Executive branch policy of
neutrality toward Jerusalem." 725 F. 3d, at 217, 216.

If the power over recognition is to mean anything, it
must mean that the President not only makes the initial,
formal recognition determination but also that he may
maintain that determination in his and his agent's state-
ments. This conclusion is a matter of both common sense

and necessity. If Congress could command the President to state a recognition position inconsistent with his own, Congress could override the President's recognition determination. Under international law, recognition may be effected by "written or oral declaration of the recognizing state." 1 Moore §27, at 73. In addition an act of recognition must "leave no doubt as to the intention to grant it." 1 Oppenheim's International Law §50, at 169. Thus, if Congress could alter the President's statements on matters of recognition or force him to contradict them, Congress in effect would exercise the recognition power.

As Justice Jackson wrote in *Youngstown*, when a Presidential power is "exclusive," it "disabl[es] the Congress from acting upon the subject." 343 U. S., at 637–638 (concurring opinion). Here, the subject is quite narrow: The Executive's exclusive power extends no further than his formal recognition determination. But as to that determination, Congress may not enact a law that directly contradicts it. This is not to say Congress may not express its disagreement with the President in myriad ways. For example, it may enact an embargo, decline to confirm an ambassador, or even declare war. But none of these acts would alter the President's recognition decision.

If Congress may not pass a law, speaking in its own voice, that effects formal recognition, then it follows that it may not force the President himself to contradict his earlier statement. That congressional command would not only prevent the Nation from speaking with one voice but also prevent the Executive itself from doing so in conducting foreign relations.

Although the statement required by §214(d) would not itself constitute a formal act of recognition, it is a mandate that the Executive contradict his prior recognition determination in an official document issued by the Secretary of State. See *Urtetiqui* v. *D'Arcy*, 9 Pet. 692, 699 (1835) (a passport "from its nature and object, is addressed to for-

eign powers" and "is to be considered . . . in the character
of a political document"). As a result, it is unconstitu-
tional. This is all the more clear in light of the longstand-
ing treatment of a passport's place-of-birth section as an
official executive statement implicating recognition. See
725 F. 3d, at 224 (Tatel, J., concurring). The Secretary's
position on this point has been consistent: He will not
place information in the place-of-birth section of a pass-
port that contradicts the President's recognition policy.
See 7 FAM §1383. If a citizen objects to the country listed
as sovereign over his place of birth, then the Secretary will
accommodate him by listing the city or town of birth ra-
ther than the country. See *id.,* §1383.6. But the Secretary
will not list a sovereign that contradicts the President's
recognition policy in a passport. Thus, the Secretary will
not list "Israel" in a passport as the country containing
Jerusalem.

The flaw in §214(d) is further underscored by the un-
doubted fact that the purpose of the statute was to in-
fringe on the recognition power—a power the Court now
holds is the sole prerogative of the President. The statute
is titled "United States Policy with Respect to Jerusalem
as the Capital of Israel." §214, 116 Stat. 1365. The House
Conference Report proclaimed that §214 "contains four
provisions related to the recognition of Jerusalem as Isra-
el's capital." H. R. Conf. Rep. No. 107–671, p. 123 (2002).
And, indeed, observers interpreted §214 as altering United
States policy regarding Jerusalem—which led to protests
across the region. See *supra*, at 4. From the face of §214,
from the legislative history, and from its reception, it is
clear that Congress wanted to express its displeasure with
the President's policy by, among other things, command-
ing the Executive to contradict his own, earlier stated
position on Jerusalem. This Congress may not do.

It is true, as Zivotofsky notes, that Congress has sub-
stantial authority over passports. See *Haig* v. *Agee*, 453

U. S. 280 (1981); *Zemel* v. *Rusk*, 381 U. S. 1 (1965); *Kent* v. *Dulles*, 357 U. S. 116 (1958). The Court does not question the power of Congress to enact passport legislation of wide scope. In *Kent* v. *Dulles*, for example, the Court held that if a person's "'liberty'" to travel "is to be regulated" through a passport, "it must be pursuant to the law-making functions of the Congress." See *id.*, at 129. Later cases, such as *Zemel* v. *Rusk* and *Haig* v. *Agee*, also proceeded on the assumption that Congress must authorize the grounds on which passports may be approved or denied. See *Zemel*, *supra*, at 7–13; *Haig*, *supra*, at 289–306. This is consistent with the extensive lawmaking power the Constitution vests in Congress over the Nation's foreign affairs.

The problem with §214(d), however, lies in how Congress exercised its authority over passports. It was an improper act for Congress to "aggrandiz[e] its power at the expense of another branch" by requiring the President to contradict an earlier recognition determination in an official document issued by the Executive Branch. *Freytag* v. *Commissioner*, 501 U. S. 868, 878 (1991). To allow Congress to control the President's communication in the context of a formal recognition determination is to allow Congress to exercise that exclusive power itself. As a result, the statute is unconstitutional.

\*   \*   \*

In holding §214(d) invalid the Court does not question the substantial powers of Congress over foreign affairs in general or passports in particular. This case is confined solely to the exclusive power of the President to control recognition determinations, including formal statements by the Executive Branch acknowledging the legitimacy of a state or government and its territorial bounds. Congress cannot command the President to contradict an earlier recognition determination in the issuance of passports.

Opinion of the Court

The judgment of the Court of Appeals for the District of Columbia Circuit is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

---

No. 13–628

---

## MENACHEM BINYAMIN ZIVOTOFSKY, BY HIS PARENTS AND GUARDIANS, ARI Z. AND NAOMI SIEGMAN ZIVOTOFSKY, PETITIONER *v.* JOHN KERRY, SECRETARY OF STATE

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 8, 2015]

JUSTICE BREYER, concurring.

I continue to believe that this case presents a political question inappropriate for judicial resolution. See *Zivotofsky* v. *Clinton*, 566 U. S. \_\_\_, \_\_\_ (2012) (BREYER, J., dissenting). But because precedent precludes resolving this case on political question grounds, see *id.*, at \_\_\_ (majority opinion) (slip op., at 1), I join the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

No. 13–628

MENACHEM BINYAMIN ZIVOTOFSKY, BY HIS PARENTS AND GUARDIANS, ARI Z. AND NAOMI SIEGMAN ZIVOTOFSKY, PETITIONER *v.* JOHN KERRY, SECRETARY OF STATE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 8, 2015]

JUSTICE THOMAS, concurring in the judgment in part and dissenting in part.

Our Constitution allocates the powers of the Federal Government over foreign affairs in two ways. First, it expressly identifies certain foreign affairs powers and vests them in particular branches, either individually or jointly. Second, it vests the residual foreign affairs powers of the Federal Government—*i.e.,* those not specifically enumerated in the Constitution—in the President by way of Article II's Vesting Clause.

Section 214(d) of the Foreign Relations Authorization Act, Fiscal Year 2003, ignores that constitutional allocation of power insofar as it directs the President, contrary to his wishes, to list "Israel" as the place of birth of Jerusalem-born citizens on their passports. The President has long regulated passports under his residual foreign affairs power, and this portion of §214(d) does not fall within any of Congress' enumerated powers.

By contrast, §214(d) poses no such problem insofar as it regulates consular reports of birth abroad. Unlike passports, these reports were developed to effectuate the naturalization laws, and they continue to serve the role of identifying persons who need not be naturalized to obtain

U. S. citizenship. The regulation of these reports does not fall within the President's foreign affairs powers, but within Congress' enumerated powers under the Naturalization and Necessary and Proper Clauses.

Rather than adhere to the Constitution's division of powers, the Court relies on a distortion of the President's recognition power to hold both of these parts of §214(d) unconstitutional. Because I cannot join this faulty analysis, I concur only in the portion of the Court's judgment holding §214(d) unconstitutional as applied to passports. I respectfully dissent from the remainder of the Court's judgment.

I

A

The Constitution specifies a number of foreign affairs powers and divides them between the political branches. Among others, Article I allocates to Congress the powers "[t]o regulate Commerce with foreign Nations," "[t]o establish an uniform Rule of Naturalization," "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations," and "[t]o declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water." Art. I, §8. For his part, the President has certain express powers relating to foreign affairs, including the powers, "by and with the Advice and Consent of the Senate," to "appoint Ambassadors," and "to make Treaties, provided two thirds of the Senators present concur." Art. II, §2. He is also assigned certain duties with respect to foreign affairs, including serving as "Commander in Chief of the Army and Navy of the United States," *ibid.*, and "receiv[ing] Ambassadors and other public Ministers," Art. II, §3.

These specific allocations, however, cannot account for the entirety of the foreign affairs powers exercised by the

Federal Government. Neither of the political branches is expressly authorized, for instance, to communicate with foreign ministers, to issue passports, or to repel sudden attacks. Yet the President has engaged in such conduct, with the support of Congress, since the earliest days of the Republic. Prakash & Ramsey, The Executive Power Over Foreign Affairs, 111 Yale L. J. 231, 298–346 (2001) (Prakash & Ramsey).

The President's longstanding practice of exercising unenumerated foreign affairs powers reflects a constitutional directive that "the President ha[s] primary responsibility—along with the necessary power—to protect the national security and to conduct the Nation's foreign relations." *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 580 (2004) (THOMAS, J., dissenting). Specifically, the Vesting Clause of Article II provides that "[t]he executive Power shall be vested in a President of the United States." Art. II, §1. This Clause is notably different from the Vesting Clause of Article I, which provides only that "[a]ll legislative Powers *herein granted* shall be vested in a Congress of the United States," Art. I, §1 (emphasis added). By omitting the words "herein granted" in Article II, the Constitution indicates that the "executive Power" vested in the President is not confined to those powers expressly identified in the document. Instead, it includes all powers originally understood as falling within the "executive Power" of the Federal Government.

B

Founding-era evidence reveals that the "executive Power" included the foreign affairs powers of a sovereign State. See Prakash & Ramsey 253. John Locke's 17th-century writings laid the groundwork for this understanding of executive power. Locke described foreign affairs powers—including the powers of "war and peace, leagues and alliances, and all the transactions with all persons

and communities without the commonwealth"—as "federative" power. Second Treatise of Civil Government §146, p. 73 (J. Gough ed. 1947). He defined the "executive" power as "comprehending the execution of the municipal laws of the society within itself upon all that are parts of it." *Id.*, §147, at 73. Importantly, however, Locke explained that the federative and executive powers must be lodged together, lest "disorder and ruin" erupt from the division of the "force of the public." *Id.*, §148, at 73–74.

Subsequent thinkers began to refer to both of these powers as aspects of "executive power." William Blackstone, for example, described the executive power in England as including foreign affairs powers, such as the "power of sending embassadors to foreign states, and receiving embassadors at home"; making "treaties, leagues, and alliances with foreign states and princes"; "making war and peace"; and "issu[ing] letters of marque and reprisal." 1 Commentaries on the Laws of England 245, 249, 250, 242–252 (1765) (Blackstone). Baron de Montesquieu similarly described executive power as including the power to "mak[e] peace or war, sen[d] or receiv[e] embassies, establis[h] the public security, and provid[e] against invasions." The Spirit of the Laws bk. XI, ch. 6, p. 151 (O. Piest ed., T. Nugent transl. 1949). In fact, "most writers of [Montesquieu's] tim[e] w[ere] inclined to think of the executive branch of government as being concerned nearly entirely with foreign affairs." W. Gwyn, The Meaning of the Separation of Powers 103 (1965).

That understanding of executive power prevailed in America. Following independence, Congress assumed control over foreign affairs under the Articles of Confederation. See, *e.g.,* Articles of Confederation, Art. IX, cl. 1. At that time, many understood that control to be an exercise of executive power. See Prakash & Ramsey 272, 275–278. Letters among Members of the Continental Congress, for instance, repeatedly referred to the Department of Foreign

Affairs, established under the control of the Continental Congress, as an "Executive departmen[t]" and to its officers as "'Executives or Ministers.'" *Id.,* at 276, and nn. 194–196. Similarly, the Essex Result of 1778—an influential report on the proposed Constitution for Massachusetts—described executive power as including both "external" and "internal" powers: The external executive power "comprehends war, peace, the sending and receiving ambassadors, and whatever concerns the transactions of the state with any other independent state," while the internal executive power "is employed in the peace, security and protection of the subject and his property." Essex Result, in The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780, pp. 324, 337 (O. Handlin & M. Handlin eds. 1966).

This view of executive power was widespread at the time of the framing of the Constitution. Thomas Rutherforth's Institutes of Natural Law—a treatise routinely cited by the Founders, McDowell, The Limits of Natural Law: Thomas Rutherforth and the American Legal Tradition, 37 Am. J. Juris. 57, 59, and n. 10 (1992)—explained that "external executive power" includes "not only what is properly called military power, but the power likewise of making war or peace, the power of engaging in alliances for an encrease of strength, . . . the power of entering into treaties, and of making leagues to restore peace . . . and the power of adjusting the rights of a nation in respect of navigation, trade, etc.," 2 Institutes of Natural Law 55–56, 54–61 (1756). During the ratification debates, James Wilson likewise referred to the "executive powers of government" as including the external powers of a nation. 2 J. Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 500–502 (1863). And Alexander Hamilton, writing as Publius, asserted that "[t]he actual conduct of foreign negotiations," "the arrangement of the army and navy, the directions of the

operations of war . . . and other matters of a like nature" are "executive details" that "fal[l] peculiarly within the province of the executive department." The Federalist No. 72, pp. 435–436 (C. Rossiter ed. 1961).

   Given this pervasive view of executive power, it is unsurprising that those who ratified the Constitution understood the "executive Power" vested by Article II to include those foreign affairs powers not otherwise allocated in the Constitution. James Iredell, for example, told the North Carolina ratifying convention that, under the new Constitution, the President would "regulate all intercourse with foreign powers" and act as the "primary agent" of the United States, though no specific allocation of foreign affairs powers in the document so provided. 4 Elliot, *supra*, at 127, 128. And Alexander Hamilton presumed as much when he argued that the "[e]nergy" created in the Constitution's Executive would be "essential to the protection of the community against foreign attacks," even though no specific allocation of foreign affairs powers provided for the Executive to repel such assaults. See The Federalist No. 70, p. 423. These statements confirm that the "executive Power" vested in the President by Article II includes the residual foreign affairs powers of the Federal Government not otherwise allocated by the Constitution.[1]

### C

   Early practice of the founding generation also supports this understanding of the "executive Power." Upon taking office, President Washington assumed the role of chief diplomat; began to direct the Secretary of Foreign Affairs who, under the Articles of Confederation, had reported to

_____

   [1] This discussion of the allocation of *federal* foreign affairs powers should not be understood to address the allocation of foreign affairs powers between the Federal Government and the States. The extent to which the States retained foreign affairs powers following ratification is not before us today.

the Congress; and established the foreign policy of the United States. Prakash & Ramsey 296–297. At the same time, he respected Congress' prerogatives to declare war, regulate foreign commerce, and appropriate funds. *Id.*, at 296.

For its part, Congress recognized a broad Presidential role in foreign affairs. *Id.*, at 297–298. It created an "Executive department" called the "Department of Foreign Affairs," with a Secretary wholly subordinate to the President. An Act for Establishing an Executive Department, to be denominated the Department of Foreign Affairs, 1 Stat. 28. The enabling Act provided that the Secretary was to "perform and execute such duties as shall from time to time be enjoined on or intrusted to him by the President," including those "relative to correspondences, commissions or instructions to or with public ministers or consuls, from the United States, or to negotiations with public ministers from foreign states or princes, or to memorials or other applications from foreign public ministers or other foreigners, or to such other matters respecting foreign affairs." §1, *id.,* at 29. By referring to those duties as those "the President of the United States shall assign to the said department," *ibid.*, the Act presumed the President inherently possessed power to engage in those tasks.

Subsequent interactions between President Washington and Congress indicated that the parties involved believed the Constitution vested the President with authority to regulate dealings with foreign nations. In his first State of the Union Address, President Washington told Congress that "[t]he interests of the United States require, that our intercourse with other nations should be facilitated by such provisions as will enable me to fulfil my duty in that respect." First Annual Message (Jan. 8, 1790), in George Washington: A Collection 467, 468 (W. Allen ed. 1988). To that end, he asked for compensation for employees and a fund designated for "defraying the expenses incident to

the conduct of our foreign affairs." *Ibid.* Congress responded by passing "An Act providing the means of intercourse between the United States and foreign nations." Ch. 22, 1 Stat. 128.

During the congressional debate over that bill, the President sought an opinion from Thomas Jefferson—at that time, Secretary of State—about the scope of the Senate's power in this area. Jefferson responded that "[t]he transaction of business with foreign nations is executive altogether." Opinion on the Powers of the Senate (Apr. 24, 1790), in 5 Writings of Thomas Jefferson 161 (P. Ford ed. 1895). As such, Jefferson concluded that it properly belonged "to the head" of the executive department, "except as to such portions of it as are specially submitted to the senate." *Ibid.* According to Washington's diaries, he received similar advice from John Jay and James Madison about "the propriety of consulting the Senate on the places to which it would be necessary to send persons in the Diplomatic line, and Consuls." 6 The Diaries of George Washington 68 (D. Jackson & D. Twohig eds. 1979). All agreed that the Senate lacked a "Constitutional right to interfere with either, & that it might be impolitic to draw it into a precedent their powers extending no farther than to an approbation or disapprobation of the person nominated by the President all the rest being Executive and vested in the President by the Constitution." *Ibid.*

Washington followed this advice. He corresponded directly with U. S. ministers, moved them among countries, and removed them from their positions at will. Prakash & Ramsey 308–309. He also corresponded with foreign leaders, representing that his role as the "'supreme executive authority'" authorized him to receive and respond to their letters on behalf of the United States. *Id.,* at 317. When foreign ministers addressed their communications to Congress, he informed them of their error. *Id.,* at 321.

Washington's control over foreign affairs extended beyond communications with other governments. When confronted with the question whether to recognize the French Republic as the lawful government of France, he received the French Republic's emissary without the involvement of Congress. *Id.,* at 312. When he later concluded that the emissary had acted inappropriately, he again acted without the involvement of Congress to ask the French executive to recall him. *Id.,* at 314–315. Washington also declared neutrality on behalf of the United States during the war between England and France in 1793, see Proclamation of Neutrality (Apr. 22, 1793), an action Hamilton pseudonymously defended as a proper exercise of the power vested in the President by the "general grant" of executive power in the Vesting Clause. Pacificus No. 1 (June 29, 1793), Letters of Pacificus and Helvidius 10 (1845); *id.,* at 3. For its part, Congress applauded the President's decision. 4 Annals of Cong. 18, 138 (1793).

In short, the practices of the Washington administration and First Congress confirm that Article II's Vesting Clause was originally understood to include a grant of residual foreign affairs power to the Executive.

## II

The statutory provision at issue implicates the President's residual foreign affairs power. Section 214(d) instructs the Secretary of State, upon request of a citizen born in Jerusalem (or that citizen's legal guardian), to list that citizen's place of birth as Israel on his passport and consular report of birth abroad, even though it is the undisputed position of the United States that Jerusalem is not a part of Israel. The President argues that this provision violates his foreign affairs powers generally and his recognition power specifically. Zivotofsky rejoins that Congress passed §214(d) pursuant to its enumerated

powers and its action must therefore take precedence.

Neither has it quite right. The President is not constitutionally compelled to implement §214(d) as it applies to passports because passport regulation falls squarely within his residual foreign affairs power and Zivotofsky has identified no source of congressional power to require the President to list Israel as the place of birth for a citizen born in Jerusalem on that citizen's passport. Section 214(d) can, however, be constitutionally applied to consular reports of birth abroad because those documents do not fall within the President's foreign affairs authority but do fall within Congress' enumerated powers over naturalization.[2]

## A

## 1

In the Anglo-American legal tradition, passports have consistently been issued and controlled by the body exercising executive power—in England, by the King; in the colonies, by the Continental Congress; and in the United States, by President Washington and every President since.

Historically, "passports were classed with those documents known as safe conducts or letters of protection, by

---

[2] The majority asserts that Zivotofsky "waived any argument that his consular report of birth abroad should be treated differently than his passport" in the court below and in this Court because he "fail[ed] to differentiate between the two documents." *Ante,* at 5. But at every stage of the proceedings, Zivotofsky has pressed his claim that he is entitled to have his place of birth listed as "Israel" on *both* his passport and his consular report of birth abroad, and the consular report issue is fairly included in the question presented. Parties cannot waive the correct interpretation of the law simply by failing to invoke it. See, *e.g., EEOC* v. *FLRA*, 476 U. S. 19, 23 (1986) (*per curiam*). That the parties have argued the case as if the same analysis should apply to both documents does not relieve this Court of its responsibility to interpret the law correctly.

which the person of an enemy might be rendered safe and inviolable." G. Hunt, U. S. Dept. of State, The American Passport: Its History 3 (1898). Letters of safe conduct and passports performed different functions in England, but both grew out of the King's prerogative to regulate the "nation's intercourse with foreign nations," see 1 Blackstone 251–253. The King issued letters of safe conduct during times of war, *id.,* at 252, whereas passports were heirs to a tradition of requiring the King's license to depart the country, see, *e.g.,* Richard II, Feb. 26, 1383, 2 Calendar of Close Rolls, pp. 281–282 (1920); 1 E. Turner, The Privy Council of England in the Seventeenth and Eighteenth Centuries 1603–1784, p. 151 (1927); see also K. Diplock, Passports and Protection in International Law, in 32 The Grotius Society, Transactions for the Year 1946, Problems of Public and Private International Law 42, 44 (1947).

Both safe conducts and passports were in use at the time of the founding. Passports were given "for greater security" "on ordinary occasions [to] persons who meet with no special interference in going and coming," whereas "safe-conduct[s]" were "given to persons who could not otherwise enter with safety the dominions of the sovereign granting it." 3 E. de Vattel, The Law of Nations §265, p. 331 (1758 ed. C. Fenwick transl. 1916) (emphasis deleted). Both were issued by the person exercising the external sovereign power of a state. See *id.*, §§162, 275, at 69, 332. In the absence of a separate executive branch of government, the Continental Congress issued passports during the American Revolution, see, *e.g.,* Resolution (May 9, 1776), in 4 Journals of the Continental Congress 340–341; Resolution (May 24, 1776), in *id.*, at 385; as did the Congress under the Articles of Confederation, see, *e.g.,* 25 *id.*, at 859 (Jan. 24, 1783) (discussing its authority to issue passports under the war power).

After the ratification of the Constitution, President

Washington immediately took responsibility for issuing passports. Hunt, *supra*, at 3. Although "'[p]ast practice does not, by itself, create power,'" "a governmental practice [that] has been open, widespread, and unchallenged since the early days of the Republic . . . should guide our interpretation of an ambiguous constitutional provision." *NLRB* v. *Noel Canning*, 573 U. S. ___, ___ (2014) (SCALIA, J., concurring in judgment) (slip op., at 5) (alteration in original; some internal quotation marks omitted). The history of the President's passport regulation in this country is one such practice. From the ratification until the end of the Civil War, the President issued passports without any authorization from Congress. As the Department of State later remarked, "In the absence of any law upon the subject, the issuing of passports to Americans going abroad naturally fell to the Department of State, as one of its manifestly proper functions." Hunt, *supra*, at 37. To that end, the Secretary's authority was "entirely discretionary." *Urtetiqui* v. *D'Arcy*, 9 Pet. 692, 699 (1835). Congress acted in support of that authority by criminalizing the "violat[ion] [of] any safe-conduct or passport duly obtained and issued under the authority of the United States." An Act for the Punishment of certain Crimes against the United States, §28, 1 Stat. 118.[3] Congress only purported to authorize the President to issue such passports in 1856 and, even under that statute, it provided that passports should be issued "under such rules as the President shall designate and prescribe for and on behalf of the United States." An Act to regulate the Diplomatic and Consular Systems of the United States, §23, 11 Stat. 60. The President has continued to designate and prescribe the rules for passports ever since.

---

[3] Until 1978, passports were not generally required to enter or exit the country except during wartime. §707, 92 Stat. 993.

2

That the President has the power to regulate passports under his residual foreign affairs powers does not, however, end the matter, for Congress has repeatedly legislated on the subject of passports. These laws have always been narrow in scope. For example, Congress enacted laws prohibiting the issuance of passports to noncitizens, *id.*, at 61, created an exception to that rule for "persons liable to military duty," Act of Mar. 3, 1863, §23, 12 Stat. 754, and then eliminated that exception, Act of May 30, 1866, ch. 102, 14 Stat. 54. It passed laws regulating the fees that the State Department should impose for issuance of the passports. Act of May 16, 1932, ch. 187, 47 Stat. 157; Act of June 4, 1920, §1, 41 Stat. 750; Act of June 15, 1917, ch. 30, Title IX, §1, 40 Stat. 227; Act of Aug. 18, 1856, §23, 11 Stat. 60; Act of Mar. 1, 1855, §12, 10 Stat. 624. It also enacted legislation addressing the duration for which passports may remain valid. §116, 96 Stat. 279; Pub. L. 90–428, 82 Stat. 446; Pub. L. 86–267, 73 Stat. 552; Act of July 3, 1926, 44 Stat. 887. And it passed laws imposing criminal penalties for false statements made when applying for passports, along with misuse of passports and counterfeiting or forgery of them. Act of June 25, 1948, 62 Stat. 771; Act of Mar. 28, 1940, §7, 54 Stat. 80; 40 Stat. 227.[4]

As with any congressional action, however, such legislation is constitutionally permissible only insofar as it is promulgated pursuant to one of Congress' enumerated powers. I must therefore address whether Congress had constitutional authority to enact §214(d)'s regulation of passports.

---

[4] JUSTICE SCALIA, in his dissent, faults me for failing to identify the enumerated power under which these laws were permissible, but the question presented in *this* case is whether §214(d) is a constitutional exercise of Congress' power, and that is the question I address.

a

Zivotofsky and congressional *amici* identify three poten-
tial sources of congressional power to enact the portion of
§214(d) dealing with passports.  Zivotofsky first argues
that it falls within Congress' power "to regulate the issu-
ance and content of United States passports."  Brief for
Petitioner 17.  The U. S. Senate, as *amicus curiae*, like-
wise contends that it can be justified under Congress'
"plenary authority over passports," which it derives from
the penumbras of its powers "'[t]o regulate Commerce
with foreign Nations'" and "'[t]o establish an uniform Rule
of Naturalization.'"    Brief for United States Senate 3
(quoting U. S. Const., Art. I, §8, cls. 3, 4).  None of these
arguments withstands scrutiny.

The Constitution contains no Passport Clause, nor does
it explicitly vest Congress with "plenary authority over
passports."  Because our Government is one of enumerated
powers, "Congress has no power to act unless the Consti-
tution authorizes it to do so."  *United States* v. *Comstock*,
560 U. S. 126, 159 (2010) (THOMAS, J., dissenting).  And
"[t]he Constitution plainly sets forth the 'few and defined'
powers that Congress may exercise."  *Ibid.*  A "passport
power" is not one of them.

Section 214(d)'s passport directive fares no better under
those powers actually included in Article I.  To start, it
does not fall within the power "[t]o regulate Commerce
with foreign Nations."  "At the time the original Constitu-
tion was ratified, 'commerce' consisted of selling, buying,
and bartering, as well as transporting for these purposes."
*United States* v. *Lopez*, 514 U. S. 549, 585 (1995) (THOMAS,
J., concurring).    The listing of the place of birth of an
applicant—whether born in Jerusalem or not—does not
involve selling, buying, bartering, or transporting for those
purposes.  Cf. *United States* v. *Morrison*, 529 U. S. 598,
613 (2000) ("[O]ur cases have upheld Commerce Clause
regulation of intrastate activity [under the power to regu-

late commerce among the several States] only where that activity is economic in nature").

True, a passport is frequently used by persons who may intend to engage in commerce abroad, but that use is insufficient to bring §214(d)'s passport directive within the scope of this power. The specific conduct at issue here—the listing of the birthplace of a U. S. citizen born in Jerusalem on a passport by the President—is not a commercial activity. Any commercial activities subsequently undertaken by the bearer of a passport are yet further removed from that regulation.

The power "[t]o establish an uniform Rule of Naturalization" is similarly unavailing. At the founding, the word "naturalization" meant "[t]he act of investing aliens with the privileges of native subjects." 2 S. Johnson, A Dictionary of the English Language 1293 (4th ed. 1773); see also T. Dyche & W. Pardon, A New General English Dictionary (1771) ("the making a foreigner or alien, a denizen or freeman of any kingdom or city, and so becoming, as it were, both a subject and a native of a king or country, that by nature he did not belong to"). A passport has never been issued as part of the naturalization process. It is—and has always been—a "travel document," Dept. of State, 7 Foreign Affairs Manual (or FAM) §1311(b) (2013), issued for the same purpose it has always served: a request from one sovereign to another for the protection of the bearer. See *supra,* at 10–12.

b

For similar reasons, the Necessary and Proper Clause gives Congress no authority here. That Clause provides, "The Congress shall have Power . . . [t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

U. S. Const., Art. I, §8, cl. 18.  As an initial matter, "Congress lacks authority to legislate [under this provision] if the objective is anything other than 'carrying into Execution' one or more of the Federal Government's enumerated powers."  *Comstock*, *supra*, at 161 (THOMAS, J., dissenting).  The "end [must] be legitimate" under our constitutional structure.  *McCulloch* v. *Maryland*, 4 Wheat. 316, 421 (1819).

But even if the objective of a law is carrying into execution one of the Federal Government's enumerated powers, the law must be both necessary and proper to that objective.  The "Clause is not a warrant to Congress to enact any law that bears some conceivable connection to the exercise of an enumerated power."  *Gonzales* v. *Raich*, 545 U. S. 1, 60 (2005) (THOMAS, J., dissenting).  Instead, "there must be a necessary and proper fit between the 'means' (the federal law) and the 'end' (the enumerated power or powers) it is designed to serve."  *Comstock*, *supra,* at 160 (THOMAS, J., dissenting).  The "means" chosen by Congress "will be deemed 'necessary' if they are 'appropriate' and 'plainly adapted' to the exercise of an enumerated power, and 'proper' if they are not otherwise 'prohibited' by the Constitution and not '[in]consistent' with its 'letter and spirit.'"  *Id.,* at 160–161  (alteration in original).

The argument that §214(d), as applied to passports, could be an exercise of Congress' power to carry into execution its foreign commerce or naturalization powers falters because this aspect of §214(d) is directed at neither of the ends served by these powers.  Although at a high level of generality, a passport could be related to foreign commerce and naturalization, that attenuated relationship is insufficient.  The law in question must be "directly link[ed]" to the enumerated power.  *Id.,* at 169, n. 8.  As applied to passports, §214(d) fails that test because it does not "'carr[y] into Execution'" Congress' foreign commerce or naturalization powers.  *Id.,* at 160.  At most, it bears a

tertiary relationship to an activity Congress is permitted to regulate: It directs the President's formulation of a document, which, in turn, may be used to facilitate travel, which, in turn, may facilitate foreign commerce. And the distinctive history of the passport as a travel rather than citizenship document makes its connection to naturalization even more tenuous.

Nor can this aspect of §214(d) be justified as an exercise of Congress' power to enact laws to carry into execution the President's residual foreign affairs powers. Simply put, §214(d)'s passport directive is not a "proper" means of carrying this power into execution.

To be "proper," a law must fall within the peculiar competence of Congress under the Constitution. Though "proper" was susceptible of several definitions at the time of the founding, only two are plausible candidates for use in the Necessary and Proper Clause—(1) "[f]it; accommodated; adapted; suitable; qualified" and (2) "[p]eculiar; not belonging to more; not common." See 2 Johnson, *supra,* at 1537. Because the former would render the word "necessary" superfluous, *McCulloch*, *supra,* at 413, and we ordinarily attempt to give effect "to each word of the Constitution," *Knowlton* v. *Moore*, 178 U. S. 41, 87 (1900), the latter is the more plausible. That is particularly true because the Constitution elsewhere uses the term "proper" by itself, Art. I, §9, Art. II, §§2, 3; the term "necessary" by itself, Art. I, §7; Art. V; and the term "necessary" as part of the phrase "necessary and expedient," Art. II, §3. Thus, the best interpretation of "proper" is that a law must fall within the peculiar jurisdiction of Congress.

Our constitutional structure imposes three key limitations on that jurisdiction: It must conform to (1) the allocation of authority within the Federal Government, (2) the allocation of power between the Federal Government and the States, and (3) the protections for retained individual rights under the Constitution. See Lawson & Granger,

The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause, 43 Duke L. J. 267, 291, 297 (1993). In other words, to be "proper," a law "must be consistent with principles of separation of powers, principles of federalism, and individual rights." *Id.*, at 297.

Commentators during the ratification debates treated "proper" as having this meaning. Writing as Publius, Hamilton posed the question who would "judge . . . the *necessity* and *propriety* of the laws to be passed for executing the powers of the Union" and responded that "[t]he propriety of a law, in a constitutional light, must always be determined by the nature of the powers upon which it is founded." The Federalist, No. 33, pp. 203–204. For example, a law that "exceeded [Congress'] jurisdiction" and invaded the authority of the States would not meet that standard. *Id.,* at 204. Similarly, an "impartial citizen" wrote in a Virginia newspaper that, even if the governmental powers could not "be executed without the aid of a law, granting commercial monopolies, inflicting unusual punishments, creating new crimes, or commanding any unconstitutional act," thus making the law necessary to the execution of a power, "such a law would be manifestly not proper," and not "warranted by this clause, without absolutely departing from the usual acceptation of words." An Impartial Citizen V, Petersburg Va. Gazette, Feb. 28, 1788, in 8 Documentary History of the Ratification of the Constitution 428, 431 (J. Kaminski & G. Saladino eds. 1988) (emphasis deleted).

Early interpretations of the Clause following ratification largely confirm that view. Lawson & Granger, *supra,* at 298–308. During debate on the Bank of the United States in the First Congress, for example, Representative Ames declared that the correct construction of the Necessary and Proper Clause "promotes the good of the society, and the ends for which the Government was adopted, without

impairing the rights of any man, or the powers of any State." 2 Annals of Cong. 1906 (1791). During the Second Congress, Representative Niles railed against a bill that would have authorized federal mail carriers to transport passengers for hire in order to reduce the cost of the mails. He said that such a law would not be "proper" to the power to establish post offices and post roads because some States had "an exclusive right of carrying passengers for hire" and an interpretation of the word "proper" that would allow the bill would render "as nugatory, all [the States'] deliberations on the Constitution" and effectively vest Congress with "general authority to legislate on every subject." 3 *id.,* at 308–310 (1792) (emphasis deleted). Each of these comments presumed that the word "proper" imposed a jurisdictional limit on congressional activity.

This evidence makes sense in light of the Framers' efforts to ensure a separation of powers, reinforced by checks and balances, as "practical and real protectio[n] for individual liberty in the new Constitution." *Perez* v. *Mortgage Bankers Assn.,* 575 U. S. ___, ___ (2015) (THOMAS, J., concurring in judgment) (slip op., at 8). If Congress could rely on the Necessary and Proper Clause to exercise power expressly allocated to the other branches or to prevent the exercise of such power by other branches, it could undermine the constitutional allocation of powers.

That the evidence thus points to a definition of "proper" that protects the separation of powers does not fully explain the way that the "proper" requirement operates when Congress seeks to facilitate the exercise of a power allocated to another branch. I can see two potential mechanisms, either or both of which may accurately reflect the original understanding of the Clause. First, a law could be "improper" if it purports to direct another branch's exercise of its power. See Calabresi & Prakash, The President's Power to Execute the Laws, 104 Yale L. J. 541, 591 (1994) ("[T]he Clause . . . does [not] allow Congress to tell

constitutionally empowered actors how they can imple-
ment their exclusive powers"). Second, a law could be
"improper" if it takes one of those actions *and* the branch
to which the power is allocated objects to the action. See
Prakash & Ramsey 255–256 ("Congress has the general
power to legislate in support of the President's foreign
policy goals. But . . . [s]ince it is derivative of the Presi-
dent's power, it must be exercised in coordination with,
and not in opposition to, the President").

I need not resolve that question today, as the applica-
tion of §214(d) to passports would be improper under
either approach. The President has made a determination
that the "place of birth" on a passport should list the
country of present sovereignty. 7 FAM, §1300, App. D,
§1330 (2014). And the President has determined that no
country is presently exercising sovereignty over the area
of Jerusalem. Thus, the President has provided that
passports for persons born in Jerusalem should list "Jeru-
salem" as the place of birth in the passport. *Id.*, §1360(f).
Section 214(d) directs the President to exercise his power
to issue and regulate the content of passports in a particu-
lar way, and the President has objected to that direction.
Under either potential mechanism for evaluating the
propriety of a law under the separation-of-powers limita-
tion, this law would be improper.[5]

c

In support of his argument that the President must
enforce §214(d), Zivotofsky relies heavily on a similar
statute addressing the place of birth designation for per-
sons born in Taiwan. See Foreign Relations Authorization
Act, Fiscal Years 1994 and 1995, §132, 108 Stat. 395.
That statute provided, "For purposes of the registration of

––––––––––

[5] Because §214(d) is not proper, I need not resolve whether such a law
could be understood to "carry into execution" the President's power.

birth or certification of nationality of a United States citizen born in Taiwan, the Secretary of State shall permit the place of birth to be recorded as Taiwan." *Ibid.* The President has adopted that practice.

The President's decision to adopt that practice, however, says nothing about the constitutionality of the Taiwan provision in the first place. The constitutional allocation of powers "does not depend on the views of individual Presidents, nor on whether the encroached upon branch approves the encroachment." *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 497 (2010) (citation and internal quotation marks omitted).[6] And the argument from Presidential acquiescence here is particularly weak, given that the Taiwan statute is consistent with the President's longstanding policy on Taiwan. At the time Congress enacted the statute, the Foreign Affairs Manual permitted consular officials to list "the city or area of birth" on a passport "[w]here the birthplace of the applicant is located in territory disputed by another country," 7 FAM §1383.5–2 (1987), and to list "the city or town, rather than the country" of an applicant's birth "when there are objections to the listing shown on the birthplace guide," *id.*, §1383.6. Because the President otherwise treats Taiwan as a geographical area within the People's Republic of China, listing Taiwan as the place of birth did not directly conflict with the President's prevailing practices. Section 214(d) *does* so conflict, as it requires the President to list citizens born in Jerusalem as born in "Israel," even though the Foreign Affairs Manual has long

————————

[6] This principle is not necessarily inconsistent with the second mechanism for evaluating congressional action under the Necessary and Proper Clause discussed above. Although that mechanism would tie the propriety of congressional action to the objection (or nonobjection) of another branch, the point of that tying feature is to determine whether, in fact, Congress has encroached upon another branch, not whether such encroachment is acceptable.

prohibited that action.

#### d

JUSTICE SCALIA would locate Congress' power to enact the passport directive of §214(d) in Congress' power under the Necessary and Proper Clause to bring into effect its enumerated power over naturalization. *Post,* at 3–4 (dissenting opinion). As an initial matter, he asserts that "[t]he naturalization power . . . enables Congress to furnish the people it makes citizens with papers verifying their citizenship," *post,* at 3, yet offers no support for this interpretation of a clause that, by its terms, grants Congress only the "Power . . . To establish an uniform Rule of Naturalization," U. S. Const., Art. I, §8, cl. 4. He then concludes that, if Congress can grant such documents, "it may also require these [documents] to record his birthplace as 'Israel'" pursuant to its power under the Necessary and Proper Clause, *post,* at 3. But this theory does not account for the President's power to act in this area, nor does it confront difficult questions about the application of the Necessary and Proper Clause in the case of conflict among the branches.

JUSTICE SCALIA disapproves of my "assertion of broad, unenumerated 'residual powers' in the President," *post,* at 19, but offers no response to my interpretation of the words "executive Power" in the Constitution. Instead, he claims that I have argued for "Presidential primacy over passports" and then rejects that position based on two postratification English statutes, the early practice of nonfederal actors issuing passports in this country, and the same congressional statutes that I have already discussed, most of which were enacted after the Civil War. *Post,* at 16–17; *supra,* at 13, and n. 4. But I do not argue that the President possesses primary power over passports. I need not argue that. I argue only that Congress did not act according to any of the powers granted to it in

the Constitution and, in such circumstances, the question of primacy does not arise.

In any event, the historical evidence cited in JUSTICE SCALIA's dissent does not conflict with my analysis of the President's power in this area. The two postratification English statutes implicitly acknowledged that passports are issued by executive officers in the exercise of executive power, see 38 Geo. III, ch. 50, §8, in 41 Eng. Stat. at Large 684; 33 Geo. III, ch. 4, §8, in 39 Eng. Stat. at Large 12, and the practice of executive officials in the States of this country confirms that relationship. In addition, neither piece of historical evidence speaks to the scope of *Congress*' power to regulate passports under our federal system. JUSTICE SCALIA's final piece of historical support—the increased congressional regulation of passports following the Civil War—is perhaps more on point from an institutional perspective, but still does not resolve the issue. Those regulations were, as I have already described, narrow in scope and continued to leave primary regulation of the content of passports to the President. To draw an inference from these "late-arising historical practices that are ambiguous at best"—and that might conflict with the original meaning of the "executive Power" and the "proper" requirement in the Necessary and Proper Clause—is a dubious way to undertake constitutional analysis. See *Noel Canning*, 573 U. S., at \_\_\_ (SCALIA, J., concurring in judgment) (slip op., at 2).

Even more dubious, however, is the cursory treatment of the Necessary and Proper Clause in JUSTICE SCALIA's dissent. He asserts that, in acting pursuant to that Clause, "Congress . . . may not transcend boundaries upon legislative authority stated or implied elsewhere in the Constitution." *Post,* at 4. But he offers no explanation for what those implied limits might be or how they would operate. Does he, for example, agree that the word "proper" requires Congress to act in a manner "'consistent with

principles of separation of powers, principles of federalism, and individual rights'"? *Supra,* at 18 (quoting Lawson & Grainger, 43 Duke L. J., at 297). If so, then why does he find that requirement satisfied in this case? Is it because he views the President as having no constitutional authority to act in this area? Or is it because he views Congress' directive to the President as consistent with the separation of powers, irrespective of the President's authority? If the latter, is that because he perceives no separation-of-powers limitations on Congress when it acts to carry into execution one of *its* enumerated powers, as opposed to the enumerated powers of *another* branch? And if that is the case, what textual, structural, or historical evidence exists for that interpretation? JUSTICE SCALIA's dissent raises more questions than it answers.

JUSTICE SCALIA's dissent *does* at least answer how, in his view, the Constitution would resolve a conflict between the political branches, each acting pursuant to the powers granted them under the Constitution. He believes that congressional power should trump in any such conflict. *Post*, at 18. I see nothing in the Constitution that clearly mandates that solution to a difficult separation-of-powers question, and I need not opine on it. I find no power under which Congress could lawfully have enacted the passport directive of §214(d), apart from its power under the Necessary and Proper Clause to carry into effect the President's powers. And I have offered textual and historical support for my conclusion that the Clause does not include the power to direct the President's exercise of his passport power.

Finally, JUSTICE SCALIA faults me for failing to consider a number of potential sources of congressional power for §214(d) not argued by any of the parties, ranging from the Fourteenth Amendment; to the Migration or Importation Clause, Art. I, §9, cl. 1; to the Territories Clause, Art. IV, §3, cl. 2. *Post,* at 15. But no one—not even JUSTICE

SCALIA—has seriously contended that those provisions would afford a basis for the passport provision of §214(d).

In the end, JUSTICE SCALIA characterizes my interpretation of the executive power, the naturalization power, and the Necessary and Proper Clause as producing "a presidency more reminiscent of George III than George Washington." *Post*, at 19. But he offers no competing interpretation of either the Article II Vesting Clause or the Necessary and Proper Clause. And his decision about the Constitution's resolution of conflict among the branches could itself be criticized as creating a supreme legislative body more reminiscent of the Parliament in England than the Congress in America.

*        *        *

Because the President has residual foreign affairs authority to regulate passports and because there appears to be no congressional power that justifies §214(d)'s application to passports, Zivotofsky's challenge to the Executive's designation of his place of birth on his passport must fail.

B

Although the consular report of birth abroad shares some features with a passport, it is historically associated with naturalization, not foreign affairs. In order to establish a "uniform Rule of Naturalization," Congress must be able to identify the categories of persons who are eligible for naturalization, along with the rules for that process. Congress thus has always regulated the "acquisition of citizenship by being born abroad of American parents . . . in the exercise of the power conferred by the Constitution to establish a uniform rule of naturalization." *United States* v. *Wong Kim Ark*, 169 U. S. 649, 688 (1898); see also *Miller* v. *Albright*, 523 U. S. 420, 456 (1998) (SCALIA, J., concurring in judgment) (recognizing that "Congress has the power to set the requirements for acquisition of

citizenship by persons not born within the territory of the United States"). It has determined that children born abroad to U. S. parents, subject to some exceptions, are natural-born citizens who do not need to go through the naturalization process. 8 U. S. C. §§ 1401(c), (d), (g).

The consular report of birth abroad is well suited to carrying into execution the power conferred on Congress in the Naturalization Clause. The report developed in response to Congress' requirement that children born abroad to U. S. citizens register with the consulate or lose their citizenship. And it continues to certify the acquisition of U. S. citizenship at birth by a person born abroad to a U. S. citizen. See 22 U. S. C. §2705(2).

Although such persons have possessed a statutory right to citizenship at birth for much of this country's history,[7] the process by which that citizenship is evidenced has varied over time. Under the 1870 consular regulations, for instance, children born abroad to U. S. citizens were issued no certificates. If they applied for a U. S. passport, then they were issued one "qualified by the obligations and duties" that attached to those citizens by virtue of their residence in a foreign nation. Regulations Prescribed For The Use Of The Consular Service of the United States App. No. IV, p. 288 (1870); see also *id.*, §109, at 38–39. Congress acted in 1907 to require children residing abroad to register with their local consulate at the age of 18. Act of Mar. 2, 1907, §6, 34 Stat. 1229. Because of the importance of this registration requirement, consular

—————

[7] The First Congress passed a law recognizing citizenship at birth for children born abroad to U. S. citizens. Act of Mar. 26, 1790, ch. 3, §1, 1 Stat. 104. An 1802 amendment to the provision rendered the availability of this citizenship uncertain. Binney, The Alienigenae of the United States, 2 Am. L. Reg. 193, 193 (1854). But Congress acted to clarify the availability of such citizenship in 1855, Act of Feb. 10, 1855, ch. 71, 10 Stat. 604, and it continues to exist to this day, see Immigration and Nationality Act, §301(a), 66 Stat. 235.

officials began to issue reports to citizens confirming their registration. See generally National Archives, General Records of the Dept. of State, Record Group 59, Passport Office, Decimal File, 1910–1949.

In 1919, the Department of State acted to standardize the consular registration of children born abroad. Report of Birth of Children to American Citizens Residing Abroad, General Instruction No. 652. It urged consulates to impress upon U. S. citizens abroad the need to record the birth of their children within two years. *Id.,* at 2. To encourage that effort, the Department permitted consular officials to issue reports attesting that the parents of U. S. citizens born abroad had presented sufficient evidence of citizenship for their children. *Ibid.*

The 1960's brought additional regulations of consular reports of birth abroad, 31 Fed. Reg. 13538 (1966), which continue in a substantially similar form to this day. See 22 CFR §§50.5, 50.7 (2014). As currently issued, the consular report of birth abroad includes the applicant's name, sex, place of birth, date of birth, and parents. It has had the "same force and effect as proof of United States citizenship as [a] certificat[e] of naturalization" since 1982. §117, 96 Stat. 279.

Thus, although registration is no longer required to maintain birthright citizenship, the consular report of birth abroad remains the primary means by which children born abroad may obtain official acknowledgement of their citizenship. See 22 CFR §51.43. Once acknowledged as U. S. citizens, they need not pursue the naturalization process to obtain the rights and privileges of citizenship in this country. Regulation of the report is thus "appropriate" and "plainly adapted" to the exercise of the naturalization power. See *Comstock*, 560 U. S., at 161 (THOMAS, J., dissenting).

By contrast, regulation of the report bears no relationship to the President's residual foreign affairs power. It

has no historical pedigree uniquely associated with the President, contains no communication directed at a foreign power, and is primarily used for domestic purposes. To the extent that a citizen born abroad seeks a document to use as evidence of his citizenship abroad, he must obtain a passport. See generally 7 FAM §1311.

Because regulation of the consular report of birth abroad is justified as an exercise of Congress' powers under the Naturalization and Necessary and Proper Clauses and does not fall within the President's foreign affairs powers, §214(d)'s treatment of that document is constitutional.[8]

## III

The majority does not perform this analysis, but instead relies on a variation of the recognition power. That power is among the foreign affairs powers vested in the President by Article II's Vesting Clause, as is confirmed by Article II's express assignment to the President of the duty of receiving foreign Ambassadors, Art. II, §3. But I cannot join the majority's analysis because no act of recognition is implicated here.[9]

---

[8] As the issue is not presented, I need not decide how a direct conflict between action pursuant to an enumerated power of Congress and action pursuant to the residual foreign affairs power of the President should be resolved.

[9] I assume, as the majority does, that the recognition power conferred on the President by the Constitution is the power to accomplish the act of recognition as that act is defined under international law. It is possible, of course, that the Framers had a fixed understanding of the act of recognition that is at odds with the definition of that act under international law. But the majority does not make that argument, nor does the majority even specifically address how consular reports of birth abroad are related to recognition. Lacking any evidence that the modern practice of recognition deviates in any relevant way from the historical practice, or that the original understanding of the recognition power was something other than the power to take part in that practice, I proceed on the same assumption as the majority.

Under international law, "recognition of a state signifies acceptance of its position within the international community and the possession by it of the full range of rights and obligations which are the normal attributes of statehood." 1 Oppenheim's International Law §47, 158 (R. Jennings & A. Watts eds., 9th ed. 1992) (footnote omitted) (Oppenheim).[10]  It can be accomplished expressly or implicitly, but the key is to discern a clear intention on the part of one state to recognize another. *Id.*, §50, at 169.  Important consequences are understood to flow from one state's recognition of another: The new state, for instance, acquires the capacity to engage in diplomatic relations, including the negotiation of treaties, with the recognizing state. *Id.*, §47, at 158.  The new state is also entitled to sue in, invoke sovereign immunity from, and demand acceptance of official acts in the courts of the recognizing state. *Ibid.*; see also I. Brownlie, Principles of Public International Law 95–96 (7th ed. 2008).

Changes in territory generally do not affect the status of a state as an international person.  Oppenheim §57, at 204–205.  France, for example, "has over the centuries retained its identity although it acquired, lost and regained parts of its territory, changed its dynasty, was a kingdom, a republic, an empire, again a kingdom, again a republic, again an empire, and is now once more a republic." *Ibid.* "Even such loss of territory as occasions the reduction of a major power to a lesser status does not affect the state as an international person." *Id.*, §57, at 205.  Changes that *would* affect the status as an international person include the union of two separate interna-

_____

[10] Scholars have long debated the extent to which official recognition by the sovereign states that make up the international community is necessary to bring a new "state" into the international community and thereby subject it to international law.  Oppenheim §39, at 128–129. Resolving this debate is not necessary to resolve the issue at hand, so I describe the modern view of recognition without endorsing it.

tional persons or a partial loss of independence. *Id.*, §58, at 206.

Assuming for the sake of argument that listing a non-recognized foreign sovereign as a citizen's place of birth on a U. S. passport could have the effect of recognizing that sovereign under international law, no such recognition would occur under the circumstances presented here. The United States has recognized Israel as a foreign sovereign since May 14, 1948. Statement by the President Announcing the Recognition of the State of Israel, Public Papers of the Presidents, Harry S. Truman, p. 258 (1964). That the United States has subsequently declined to acknowledge Israel's sovereignty over Jerusalem has not changed its recognition of Israel as a sovereign state. And even if the United States were to acknowledge Israel's sovereignty over Jerusalem, that action would not change its recognition of Israel as a sovereign state. That is because the United States has already afforded Israel the rights and responsibilities attendant to its status as a sovereign State. Taking a different position on the Jerusalem question will have no effect on that recognition.[11]

Perhaps recognizing that a formal recognition is not implicated here, the majority reasons that, if the Executive's exclusive recognition power "is to mean anything, it must mean that the President not only makes the initial, formal recognition determination but also that he may maintain that determination in his and his agent's statements." *Ante,* at 26. By "alter[ing] the President's statements on matters of recognition or forc[ing] him to contradict them," the majority reasons, "Congress in effect would exercise the recognition power." *Ante*, at 27. This argument stretches the recognition power beyond all recogni-

_____

[11] The analysis might look different if §214(d) required the President to list as a "place of birth" a country that the United States has never officially recognized. That is not the case here.

tion.  Listing a Jerusalem-born citizen's place of birth as "Israel" cannot amount to recognition because the United States already recognizes Israel as an international person.  Rather than adopt a novel definition of the recognition power, the majority should have looked to other foreign affairs powers in the Constitution to resolve this dispute.

\*    \*    \*

Adhering to the Constitution's allocation of powers leads me to reach a different conclusion in this case from my colleagues: Section 214(d) can be constitutionally applied to consular reports of birth abroad, but not passports.  I therefore respectfully concur in the judgment in part and dissent in part.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–628

_____

MENACHEM BINYAMIN ZIVOTOFSKY, BY HIS PARENTS AND GUARDIANS, ARI Z. AND NAOMI SIEGMAN ZIVOTOFSKY, PETITIONER *v.* JOHN KERRY, SECRETARY OF STATE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 8, 2015]

CHIEF JUSTICE ROBERTS, with whom JUSTICE ALITO joins, dissenting.

Today's decision is a first: Never before has this Court accepted a President's direct defiance of an Act of Congress in the field of foreign affairs. We have instead stressed that the President's power reaches "its lowest ebb" when he contravenes the express will of Congress, "for what is at stake is the equilibrium established by our constitutional system." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 637–638 (1952) (Jackson, J., concurring).

JUSTICE SCALIA's principal dissent, which I join in full, refutes the majority's unprecedented holding in detail. I write separately to underscore the stark nature of the Court's error on a basic question of separation of powers.

The first principles in this area are firmly established. The Constitution allocates some foreign policy powers to the Executive, grants some to the Legislature, and enjoins the President to "take Care that the Laws be faithfully executed." Art. II, §3. The Executive may disregard "the expressed or implied will of Congress" only if the Constitution grants him a power "at once so conclusive and preclusive" as to "disabl[e] the Congress from acting upon the

subject." *Youngstown*, 343 U. S., at 637–638 (Jackson, J., concurring).

Assertions of exclusive and preclusive power leave the Executive "in the least favorable of possible constitutional postures," and such claims have been "scrutinized with caution" throughout this Court's history. *Id.*, at 640, 638; see *Dames & Moore* v. *Regan*, 453 U. S. 654, 668–669 (1981). For our first 225 years, no President prevailed when contradicting a statute in the field of foreign affairs. See *Medellín* v. *Texas*, 552 U. S. 491, 524–532 (2008); *Hamdan* v. *Rumsfeld*, 548 U. S. 557, 590–595, 613–625 (2006); *Youngstown*, 343 U. S*.,* at 587–589 (majority opinion); *Little* v. *Barreme*, 2 Cranch 170, 177–179 (1804).

In this case, the President claims the exclusive and preclusive power to recognize foreign sovereigns. The Court devotes much of its analysis to accepting the Executive's contention. *Ante*, at 6–26. I have serious doubts about that position. The majority places great weight on the Reception Clause, which directs that the Executive "shall receive Ambassadors and other public Ministers." Art. II, §3. But that provision, framed as an obligation rather than an authorization, appears alongside the *duties* imposed on the President by Article II, Section 3, not the *powers* granted to him by Article II, Section 2. Indeed, the People ratified the Constitution with Alexander Hamilton's assurance that executive reception of ambassadors "is more a matter of dignity than of authority" and "will be without consequence in the administration of the government." The Federalist No. 69, p. 420 (C. Rossiter ed. 1961). In short, at the time of the founding, "there was no reason to view the reception clause as a source of discretionary authority for the president." Adler, The President's Recognition Power: Ministerial or Discretionary? 25 Presidential Studies Q. 267, 269 (1995).

The majority's other asserted textual bases are even more tenuous. The President does have power to make

treaties and appoint ambassadors. Art. II, §2. But those authorities are *shared* with Congress, *ibid.*, so they hardly support an inference that the recognition power is *exclusive*.

Precedent and history lend no more weight to the Court's position. The majority cites dicta suggesting an exclusive executive recognition power, but acknowledges contrary dicta suggesting that the power is shared. See, *e.g.*, *United States* v. *Palmer*, 3 Wheat. 610, 643 (1818) ("the courts of the union must view [a] newly constituted government as it is viewed by *the legislative and executive departments* of the government of the United States" (emphasis added)). When the best you can muster is conflicting dicta, precedent can hardly be said to support your side.

As for history, the majority admits that it too points in both directions. Some Presidents have claimed an exclusive recognition power, but others have expressed uncertainty about whether such preclusive authority exists. Those in the skeptical camp include Andrew Jackson and Abraham Lincoln, leaders not generally known for their cramped conceptions of Presidential power. Congress has also asserted its authority over recognition determinations at numerous points in history. The majority therefore falls short of demonstrating that "Congress has accepted" the President's exclusive recognition power. *Ante*, at 26. In any event, we have held that congressional acquiescence is only "pertinent" when the President acts in the absence of express congressional authorization, not when he asserts power to disregard a statute, as the Executive does here. *Medellín*, 552 U. S., at 528; see *Dames & Moore*, 453 U. S., at 678–679.

In sum, although the President has authority over recognition, I am not convinced that the Constitution provides the "conclusive and preclusive" power required to justify defiance of an express legislative mandate.

*Youngstown*, 343 U. S., at 638 (Jackson, J., concurring).
As the leading scholar on this issue has concluded, the
"text, original understanding, post-ratification history,
and structure of the Constitution do not support the . . .
expansive claim that this executive power is plenary."
Reinstein, Is the President's Recognition Power Exclusive?
86 Temp. L. Rev. 1, 60 (2013).

But even if the President does have exclusive recogni-
tion power, he still cannot prevail in this case, because the
statute at issue *does not implicate recognition*. See *Zivo-
tofsky* v. *Clinton*, 566 U. S. ___, ___ (2012) (ALITO, J.,
concurring in judgment) (slip op., at 1); *post*, at 5–10
(SCALIA, J., dissenting). The relevant provision, §214(d),
simply gives an American citizen born in Jerusalem the
option to designate his place of birth as Israel "[f]or pur-
poses of" passports and other documents. Foreign Rela-
tions Authorization Act, Fiscal Year 2003, 116 Stat. 1366.
The State Department itself has explained that "identifi-
cation"—not recognition—"is the principal reason that
U. S. passports require 'place of birth.'" App. 42. Con-
gress has not disputed the Executive's assurances that
§214(d) does not alter the longstanding United States
position on Jerusalem. And the annals of diplomatic
history record no examples of official recognition accom-
plished via optional passport designation.

The majority acknowledges both that the "Executive's
exclusive power extends no further than his formal recog-
nition determination" and that §214(d) does "not itself
constitute a formal act of recognition." *Ante*, at 27. Taken
together, these statements come close to a confession of
error. The majority attempts to reconcile its position by
reconceiving §214(d) as a "mandate that the Executive
contradict his prior recognition determination in an offi-
cial document issued by the Secretary of State." *Ante*, at
27. But as just noted, neither Congress nor the Executive
Branch regards §214(d) as a recognition determination, so

it is hard to see how the statute could contradict any such determination.

At most, the majority worries that there may be a *perceived* contradiction based on a *mistaken* understanding of the effect of §214(d), insisting that some "observers interpreted §214 as altering United States policy regarding Jerusalem." *Ante*, at 28. To afford controlling weight to such impressions, however, is essentially to subject a duly enacted statute to an international heckler's veto.

Moreover, expanding the President's purportedly exclusive recognition power to include authority to avoid potential misunderstandings of legislative enactments proves far too much. Congress could validly exercise its enumerated powers in countless ways that would create more severe perceived contradictions with Presidential recognition decisions than does §214(d). If, for example, the President recognized a particular country in opposition to Congress's wishes, Congress could declare war or impose a trade embargo on that country. A neutral observer might well conclude that these legislative actions had, to put it mildly, created a perceived contradiction with the President's recognition decision. And yet each of them would undoubtedly be constitutional. See *ante*, at 27. So too would statements by nonlegislative actors that might be seen to contradict the President's recognition positions, such as the declaration in a political party platform that "Jerusalem is and will remain the capital of Israel." Landler, Pushed by Obama, Democrats Alter Platform Over Jerusalem, N. Y. Times, Sept. 6, 2012, p. A14.

Ultimately, the only power that could support the President's position is the one the majority purports to reject: the "exclusive authority to conduct diplomatic relations." Brief for Respondent 18. The Government offers a single citation for this allegedly exclusive power: *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 319–320 (1936). But as the majority rightly acknowledges, *Curtiss-*

*Wright* did not involve a claim that the Executive could contravene a statute; it held only that he could act pursuant to a legislative delegation. *Ante*, at 17.

The expansive language in *Curtiss-Wright* casting the President as the "sole organ" of the Nation in foreign affairs certainly has attraction for members of the Executive Branch. The Solicitor General invokes the case no fewer than ten times in his brief. Brief for Respondent 9, 10, 18, 19, 23, 24, 53, 54. But our precedents have never accepted such a sweeping understanding of executive power. See *Hamdan*, 548 U. S., at 591–592; *Dames & Moore*, 453 U. S., at 661–662; *Youngstown*, 343 U. S., at 587 (majority opinion); *id.*, at 635, n. 2 (Jackson, J., concurring); cf. *Little*, 2 Cranch, at 179 (Marshall, C. J.) ("I confess the first bias of my mind was very strong in favour of . . . the executive . . . [b]ut I have been convinced that I was mistaken.").

Just a few Terms ago, this Court rejected the President's argument that a broad foreign relations power allowed him to override a state court decision that contradicted U. S. international law obligations. *Medellín*, 552 U. S., at 523–532. If the President's so-called general foreign relations authority does not permit him to countermand a State's lawful action, it surely does not authorize him to disregard an express statutory directive enacted by Congress, which—unlike the States—has extensive foreign relations powers of its own. Unfortunately, despite its protest to the contrary, the majority today allows the Executive to do just that.

Resolving the status of Jerusalem may be vexing, but resolving this case is not. Whatever recognition power the President may have, exclusive or otherwise, is not implicated by §214(d). It has not been necessary over the past 225 years to definitively resolve a dispute between Congress and the President over the recognition power. Perhaps we could have waited another 225 years. But instead

ROBERTS, C. J., dissenting

the majority strains to reach the question based on the mere possibility that observers overseas might misperceive the significance of the birthplace designation at issue in this case. And in the process, the Court takes the perilous step—for the first time in our history—of allowing the President to defy an Act of Congress in the field of foreign affairs.

   I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

---

No. 13–628

---

## MENACHEM BINYAMIN ZIVOTOFSKY, BY HIS PARENTS AND GUARDIANS, ARI Z. AND NAOMI SIEGMAN ZIVOTOFSKY, PETITIONER *v.* JOHN KERRY, SECRETARY OF STATE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 8, 2015]

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE ALITO join, dissenting.

Before this country declared independence, the law of England entrusted the King with the exclusive care of his kingdom's foreign affairs. The royal prerogative included the "sole power of sending ambassadors to foreign states, and receiving them at home," the sole authority to "make treaties, leagues, and alliances with foreign states and princes," "the sole prerogative of making war and peace," and the "sole power of raising and regulating fleets and armies." 1 W. Blackstone, Commentaries *253, *257, *262. The People of the United States had other ideas when they organized our Government. They considered a sound structure of balanced powers essential to the preservation of just government, and international relations formed no exception to that principle.

The People therefore adopted a Constitution that divides responsibility for the Nation's foreign concerns between the legislative and executive departments. The Constitution gave the President the "executive Power," authority to send and responsibility to receive ambassadors, power to make treaties, and command of the Army and Navy—though they qualified some of these powers by

requiring consent of the Senate. Art. II, §§1–3. At the same time, they gave Congress powers over war, foreign commerce, naturalization, and more. Art. I, §8. "Fully eleven of the powers that Article I, §8 grants Congress deal in some way with foreign affairs." L. Tribe, American Constitutional Law, §5–18, p. 965.

This case arises out of a dispute between the Executive and Legislative Branches about whether the United States should treat Jerusalem as a part of Israel. The Constitution contemplates that the political branches will make policy about the territorial claims of foreign nations the same way they make policy about other international matters: The President will exercise his powers on the basis of his views, Congress its powers on the basis of its views. That is just what has happened here.

## I

The political branches of our Government agree on the real-world fact that Israel controls the city of Jerusalem. See Jerusalem Embassy Act of 1995, 109 Stat. 398; Brief for Respondent 3. They disagree, however, about how official documents should record the birthplace of an American citizen born in Jerusalem. The Executive does not accept any state's claim to sovereignty over Jerusalem, and it maintains that the birthplace designation "Israel" would clash with this stance of neutrality. But the National Legislature has enacted a statute that provides: "For purposes of the registration of birth, certification of nationality, or issuance of a passport of a United States citizen born in the city of Jerusalem, the Secretary [of State] shall, upon the request of the citizen or the citizen's legal guardian, record the place of birth as Israel." Foreign Relations Authorization Act, Fiscal Year 2003, §214(d), 116 Stat. 1366. Menachem Zivotofsky's parents seek enforcement of this statutory right in the issuance of their son's passport and consular report of birth abroad.

They regard their son's birthplace as a part of Israel and insist as "a matter of conscience" that his Israeli nativity "not be erased" from his identity documents. App. 26.

Before turning to Presidential power under Article II, I think it well to establish the statute's basis in congressional power under Article I. Congress's power to "establish an uniform Rule of Naturalization," Art. I, §8, cl. 4, enables it to grant American citizenship to someone born abroad. *United States* v. *Wong Kim Ark*, 169 U. S. 649, 702–703 (1898). The naturalization power also enables Congress to furnish the people it makes citizens with papers verifying their citizenship—say a consular report of birth abroad (which certifies citizenship of an American born outside the United States) or a passport (which certifies citizenship for purposes of international travel). As the Necessary and Proper Clause confirms, every congressional power "carries with it all those incidental powers which are necessary to its complete and effectual execution." *Cohens* v. *Virginia*, 6 Wheat. 264, 429 (1821). Even on a miserly understanding of Congress's incidental authority, Congress may make grants of citizenship "effectual" by providing for the issuance of certificates authenticating them.

One would think that if Congress may grant Zivotofsky a passport and a birth report, it may also require these papers to record his birthplace as "Israel." The birthplace specification promotes the document's citizenship-authenticating function by identifying the bearer, distinguishing people with similar names but different birthplaces from each other, helping authorities uncover identity fraud, and facilitating retrieval of the Government's citizenship records. See App. 70. To be sure, recording Zivotovsky's birthplace as "Jerusalem" rather than "Israel" would fulfill these objectives, but when faced with alternative ways to carry its powers into execution, Congress has the "discretion" to choose the one it deems "most beneficial

to the people." *McCulloch* v. *Maryland*, 4 Wheat. 316, 421
(1819).   It thus has the right to decide that recording
birthplaces as "Israel" makes for better foreign policy.  Or
that regardless of international politics, a passport or
birth report should respect its bearer's conscientious belief
that Jerusalem belongs to Israel.

No doubt congressional discretion in executing legisla-
tive powers has its limits; Congress's chosen approach
must be not only "necessary" to carrying its powers into
execution, but also "proper."   Congress thus may not
transcend boundaries upon legislative authority stated or
implied elsewhere in the Constitution.  But as we shall
see, §214(d) does not transgress any such restriction.

II

The Court frames this case as a debate about recogni-
tion.  Recognition is a sovereign's official acceptance of a
status under international law.  A sovereign might recog-
nize a foreign entity as a state, a regime as the other
state's government, a place as part of the other state's
territory, rebel forces in the other state as a belligerent
power, and so on.  2 M. Whiteman, Digest of International
Law §1 (1963) (hereinafter Whiteman).  President Truman
recognized Israel as a state in 1948, but Presidents have
consistently declined to recognize Jerusalem as a part of
Israel's (or any other state's) sovereign territory.

The Court holds that the Constitution makes the Presi-
dent alone responsible for recognition and that §214(d)
invades this exclusive power.  I agree that the Constitu-
tion *empowers* the President to extend recognition on
behalf of the United States, but I find it a much harder
question whether it makes that power exclusive.   The
Court tells us that "the weight of historical evidence"
supports exclusive executive authority over "the formal
determination of recognition." *Ante,* at 20. But even with
its attention confined to formal recognition, the Court is

forced to admit that "history is not all on one side." *Ibid.* To take a stark example, Congress legislated in 1934 to grant independence to the Philippines, which were then an American colony. 48 Stat. 456. In the course of doing so, Congress directed the President to "recognize the independence of the Philippine Islands as a separate and self-governing nation" and to "acknowledge the authority and control over the same of the government instituted by the people thereof." §10, *id.,* at 463. Constitutional? And if Congress may control recognition when exercising its power "to dispose of . . . the Territory or other Property belonging to the United States," Art. IV, §3, cl. 2, why not when exercising other enumerated powers? Neither text nor history nor precedent yields a clear answer to these questions. Fortunately, I have no need to confront these matters today—nor does the Court—because §214(d) plainly does not concern recognition.

Recognition is more than an announcement of a policy. Like the ratification of an international agreement or the termination of a treaty, it is a formal legal act with effects under international law. It signifies acceptance of an international status, and it makes a commitment to continued acceptance of that status and respect for any attendant rights. See, *e.g.,* Convention on the Rights and Duties of States, Art. 6, Dec. 26, 1933, 49 Stat. 3100, T. S. No. 881. "Its legal effect is to create an estoppel. By granting recognition, [states] debar themselves from challenging in future whatever they have previously acknowledged." 1 G. Schwarzenberger, International Law 127 (3d ed. 1957). In order to extend recognition, a state must perform an act that unequivocally manifests that intention. Whiteman §3. That act can consist of an express conferral of recognition, or one of a handful of acts that by international custom imply recognition—chiefly, entering into a bilateral treaty, and sending or receiving an ambassador. *Ibid.*

To know all this is to realize at once that §214(d) has nothing to do with recognition. Section 214(d) does not require the Secretary to make a formal declaration about Israel's sovereignty over Jerusalem. And nobody suggests that international custom infers acceptance of sovereignty from the birthplace designation on a passport or birth report, as it does from bilateral treaties or exchanges of ambassadors. Recognition would preclude the United States (as a matter of international law) from later contesting Israeli sovereignty over Jerusalem. But making a notation in a passport or birth report does not encumber the Republic with any international obligations. It leaves the Nation free (so far as international law is concerned) to change its mind in the future. That would be true even if the statute required *all* passports to list "Israel." But in fact it requires only those passports to list "Israel" for which the citizen (or his guardian) *requests* "Israel"; all the rest, under the Secretary's policy, list "Jerusalem." It is utterly impossible for this deference to private requests to constitute an act that unequivocally manifests an intention to grant recognition.

Section 214(d) performs a more prosaic function than extending recognition. Just as foreign countries care about what our Government has to say about their borders, so too American citizens often care about what our Government has to say about their identities. Cf. *Bowen* v. *Roy*, 476 U. S. 693 (1986). The State Department does not grant or deny recognition in order to accommodate these individuals, but it does make exceptions to its rules about how it records birthplaces. Although normal protocol requires specifying the bearer's country of birth in his passport, Dept. of State, 7 Foreign Affairs Manual (FAM) §1300, App. D, §1330(a) (2014), the State Department will, if the bearer protests, specify the city of birth instead—so that an Irish nationalist may have his birthplace recorded as "Belfast" rather than "United Kingdom," *id.,* §1380(a).

And although normal protocol requires specifying the country with *present* sovereignty over the bearer's place of birth, *id.,* §1330(b), a special exception allows a bearer born before 1948 in what was then Palestine to have his birthplace listed as "Palestine," *id.*, §1360(g). Section 214(d) requires the State Department to make a further accommodation. Even though the Department normally refuses to specify a country that lacks recognized sovereignty over the bearer's birthplace, it must suspend that policy upon the request of an American citizen born in Jerusalem. Granting a request to specify "Israel" rather than "Jerusalem" does not recognize Israel's sovereignty over Jerusalem, just as granting a request to specify "Belfast" rather than "United Kingdom" does not derecognize the United Kingdom's sovereignty over Northern Ireland.

The best indication that §214(d) does not concern recognition comes from the State Department's policies concerning Taiwan. According to the Solicitor General, the United States "acknowledges the Chinese position" that Taiwan is a part of China, but "does not take a position" of its own on that issue. Brief for Respondent 51–52. Even so, the State Department has for a long time recorded the birthplace of a citizen born in Taiwan as "China." It indeed *insisted* on doing so until Congress passed a law (on which §214(d) was modeled) giving citizens the option to have their birthplaces recorded as "Taiwan." See §132, 108 Stat. 395, as amended by §1(r), 108 Stat. 4302. The Solicitor General explains that the designation "China" "involves a geographic description, not an assertion that Taiwan is . . . part of sovereign China." Brief for Respondent 51–52. Quite so. Section 214(d) likewise calls for nothing beyond a "geographic description"; it does not require the Executive even to assert, never mind formally recognize, that Jerusalem is a part of sovereign Israel. Since birthplace specifications in citizenship documents are matters within Congress's control, Congress may treat

Jerusalem as a part of Israel when regulating the record-
ing of birthplaces, even if the President does not do so
when extending recognition.  Section 214(d), by the way,
expressly directs the Secretary to "record the place of birth
as Israel" "*[f]or purposes of* the registration of birth, certi-
fication of nationality, or issuance of a passport."  (Em-
phasis added.)  And the law bears the caption, "Record of
Place of Birth as Israel *for Passport Purposes.*"  (Emphasis
added.)  Finding recognition in this provision is rather like
finding admission to the Union in a provision that treats
American Samoa as a State for purposes of a federal
highway safety program, 23 U. S. C. §401.

### III

The Court complains that §214(d) requires the Secretary
of State to issue official documents implying that Jerusa-
lem is a part of Israel; that it appears in a section of the
statute bearing the title "United States Policy with Re-
spect to Jerusalem as the Capital of Israel"; and that
foreign "observers interpreted [it] as altering United
States policy regarding Jerusalem."  *Ante,* at 28.  But
these features do not show that §214(d) recognizes Israel's
sovereignty over Jerusalem.  They show only that the law
displays symbolic support for Israel's territorial claim.
That symbolism may have tremendous significance as a
matter of international diplomacy, but it makes no differ-
ence as a matter of constitutional law.

Even if the Constitution gives the President sole power
to extend recognition, it does not give him sole power to
make all decisions relating to foreign disputes over sover-
eignty.  To the contrary, a fair reading of Article I allows
Congress to decide for itself how its laws should handle
these controversies.  Read naturally, power to "regulate
Commerce with foreign Nations," §8, cl. 3, includes power
to regulate imports from Gibraltar as British goods or as
Spanish goods.  Read naturally, power to "regulate the

Value . . . of foreign Coin," §8, cl. 5, includes power to honor (or not) currency issued by Taiwan. And so on for the other enumerated powers. These are not airy hypotheticals. A trade statute from 1800, for example, provided that "the whole of the island of Hispaniola"—whose status was then in controversy—"shall for purposes of [the] act be considered as a dependency of the French Republic." §7, 2 Stat. 10. In 1938, Congress allowed admission of the Vatican City's public records in federal courts, decades before the United States extended formal recognition. ch. 682, 52 Stat. 1163; Whiteman §68. The Taiwan Relations Act of 1979 grants Taiwan capacity to sue and be sued, even though the United States does not recognize it as a state. 22 U. S. C. §3303(b)(7). Section 214(d) continues in the same tradition.

The Constitution likewise does not give the President exclusive power to determine which claims to statehood and territory "are legitimate in the eyes of the United States," *ante,* at 11. Congress may express its own views about these matters by declaring war, restricting trade, denying foreign aid, and much else besides. To take just one example, in 1991, Congress responded to Iraq's invasion of Kuwait by enacting a resolution authorizing use of military force. 105 Stat. 3. No doubt the resolution reflected Congress's views about the legitimacy of Iraq's territorial claim. The preamble referred to Iraq's "illegal occupation" and stated that "the international community has demanded . . . that Kuwait's independence and legitimate government be restored." *Ibid.* These statements are far more categorical than the caption "United States Policy with Respect to Jerusalem as the Capital of Israel." Does it follow that the authorization of the use of military force invaded the President's exclusive powers? Or that it would have done so had the President recognized Iraqi sovereignty over Kuwait?

History does not even support an exclusive Presidential

power to make what the Court calls "formal statements" about "the legitimacy of a state or government and its territorial bounds," *ante,* at 29. For a long time, the Houses of Congress have made formal statements announcing their own positions on these issues, again without provoking constitutional objections. A recent resolution expressed the House of Representatives' "strong support for the legitimate, democratically-elected Government of Lebanon" and condemned an "illegitimate" and "unjustifiable" insurrection by "the terrorist group Hizballah." H. Res. 1194, 110th Cong, 2d Sess., 1, 4 (2008). An earlier enactment declared "the sense of the Congress that . . . Tibet . . . is an occupied country under the established principles of international law" and that "Tibet's true representatives are the Dalai Lama and the Tibetan Government in exile." §355, 105 Stat. 713 (1991). After Texas won independence from Mexico, the Senate resolved that "the State of Texas having established and maintained an independent Government, . . . it is expedient and proper . . . that the independent political existence of the said State be acknowledged by the Government of the United States." Cong. Globe, 24th Cong., 2d Sess., 83 (1837); see *id.,* at 270.

In the final analysis, the Constitution may well deny Congress power to recognize—the power to make an international commitment accepting a foreign entity as a state, a regime as its government, a place as a part of its territory, and so on. But whatever else §214(d) may do, it plainly does not make (or require the President to make) a commitment accepting Israel's sovereignty over Jerusalem.

## IV

The Court does not try to argue that §214(d) extends recognition; nor does it try to argue that the President holds the exclusive power to make all nonrecognition

decisions relating to the status of Jerusalem. As just shown, these arguments would be impossible to make with a straight face.

The Court instead announces a rule that is blatantly gerrymandered to the facts of this case. It concludes that, in addition to the exclusive power to make the "formal recognition determination," the President holds an ancillary exclusive power "to control . . . formal statements by the Executive Branch acknowledging the legitimacy of a state or government and its territorial bounds." *Ante,* at 29. It follows, the Court explains, that Congress may not "requir[e] the President to contradict an earlier recognition determination in an official document issued by the Executive Branch." *Ibid.* So requiring imports from Jerusalem to be taxed like goods from Israel is fine, but requiring Customs to issue an official invoice to that effect is not? Nonsense.

Recognition is a type of legal act, not a type of statement. It is a leap worthy of the Mad Hatter to go from exclusive authority over making legal commitments about sovereignty to exclusive authority over making statements or issuing documents about national borders. The Court may as well jump from power over issuing declaratory judgments to a monopoly on writing law-review articles.

No consistent or coherent theory supports the Court's decision. At times, the Court seems concerned with the possibility of congressional interference with the President's ability to extend or withhold legal recognition. The Court concedes, as it must, that the notation required by §214(d) "would not itself constitute a formal act of recognition." *Ante,* at 27. It still frets, however, that Congress *could* try to regulate the President's "statements" in a way that "override[s] the President's recognition determination." *Ibid.* But "[t]he circumstance, that . . . [a] power may be abused, is no answer. All powers may be abused." 2 J. Story, Commentaries on the Constitution of the

United States §921, p. 386 (1833). What matters is whether *this* law interferes with the President's ability to withhold recognition. It would be comical to claim that it does. The Court identifies no reason to believe that the United States—or indeed any other country—uses the place-of-birth field in passports and birth reports as a forum for performing the act of recognition. That is why nobody thinks the United States withdraws recognition from Canada when it accommodates a Quebec nationalist's request to have his birthplace recorded as "Montreal."

To the extent doubts linger about whether the United States recognizes Israel's sovereignty over Jerusalem, §214(d) leaves the President free to dispel them by issuing a disclaimer of intent to recognize. A disclaimer always suffices to prevent an act from effecting recognition. Restatement (Second) of Foreign Relations Law of the United States §104(1) (1962). Recall that an earlier law grants citizens born in Taiwan the right to have their birthplaces recorded as "Taiwan." The State Department has complied with the law, but states in its Foreign Affairs Manual: "The United States does not officially recognize Taiwan as a 'state' or 'country,' although passport issuing officers may enter 'Taiwan' as a place of birth." 7 FAM §1300, App. D, §1340(d)(6). Nothing stops a similar disclaimer here.

At other times, the Court seems concerned with Congress's failure to give effect to a recognition decision that the President has already made. The Court protests, for instance, that §214(d) "directly contradicts" the President's refusal to recognize Israel's sovereignty over Jerusalem. *Ante,* at 27. But even if the Constitution empowers the President alone to extend recognition, it nowhere obliges Congress to align its laws with the President's recognition decisions. Because the President and Congress are "perfectly co-ordinate by the terms of their common commission," The Federalist No. 49, p. 314 (C. Ros-

siter ed. 1961) (Madison), the President's use of the recognition power does not constrain Congress's use of its legislative powers.

Congress has legislated without regard to recognition for a long time and in a range of settings. For example, responding in 1817 and 1818 to revolutions in Latin America, Congress amended federal neutrality laws—which originally prohibited private military action for or against *recognized* states—to prohibit private hostilities against *unrecognized* states too. ch. 58, 3 Stat. 370; ch. 88, 3 Stat. 447; see *The Three Friends*, 166 U. S. 1, 52–59 (1897). Legislation from 90 years ago provided for the revision of national immigration quotas upon one country's surrender of territory to another, even if "the transfer . . . has not been recognized by the United States." §12(c), 43 Stat. 161 (1924). Federal law today prohibits murdering a foreign government's officials, 18 U. S. C. §1116, counterfeiting a foreign government's bonds, §478, and using American vessels to smuggle goods in violation of a foreign government's laws, §546—all "irrespective of recognition by the United States," §§11, 1116. Just as Congress may legislate independently of recognition in all of those areas, so too may it legislate independently of recognition when regulating the recording of birthplaces.

The Court elsewhere objects that §214(d) interferes with the autonomy and unity of the Executive Branch, setting the branch against itself. The Court suggests, for instance, that the law prevents the President from maintaining his neutrality about Jerusalem in "his and his agent's statements." *Ante,* at 26. That is of no constitutional significance. As just shown, Congress has power to legislate without regard to recognition, and where Congress has the power to legislate, the President has a duty to "take Care" that its legislation "be faithfully executed," Art. II, §3. It is likewise "the duty of the secretary of state to conform to the law"; where Congress imposes a respon-

sibility on him, "he is so far the officer of the law; is amenable to the laws for his conduct; and cannot at his discretion sport away the vested rights of others." *Marbury* v. *Madison*, 1 Cranch 137, 158, 166 (1803). The Executive's involvement in carrying out this law does not affect its constitutionality; the Executive carries out every law.

The Court's error could be made more apparent by applying its reasoning to the President's power "to make Treaties," Art. II, §2, cl. 2. There is no question that Congress may, if it wishes, pass laws that openly flout treaties made by the President. *Head Money Cases*, 112 U. S. 580, 597 (1884). Would anyone have dreamt that the President may refuse to carry out such laws—or, to bring the point closer to home, refuse to execute federal courts' judgments under such laws—so that the Executive may "speak with one voice" about the country's international obligations? To ask is to answer. Today's holding puts the implied power to recognize territorial claims (which the Court infers from the power to recognize states, which it infers from the responsibility to receive ambassadors) on a higher footing than the express power to make treaties. And this, even though the Federalist describes the making of treaties as a "delicate and important prerogative," but the reception of ambassadors as "more a matter of dignity than of authority," "a circumstance which will be without consequence in the administration of the government." The Federalist No. 69, p. 420 (Hamilton).

In the end, the Court's decision does not rest on text or history or precedent. It instead comes down to "functional considerations"—principally the Court's perception that the Nation "must speak with one voice" about the status of Jerusalem. *Ante,* at 11 (ellipsis and internal quotation marks omitted). The vices of this mode of analysis go beyond mere lack of footing in the Constitution. Functionalism of the sort the Court practices today will *systematically* favor the unitary President over the plural Con-

gress in disputes involving foreign affairs. It is possible that this approach will make for more effective foreign policy, perhaps as effective as that of a monarchy. It is certain that, in the long run, it will erode the structure of separated powers that the People established for the protection of their liberty.

V

JUSTICE THOMAS's concurrence deems §214(d) constitutional to the extent it regulates birth reports, but unconstitutional to the extent it regulates passports. *Ante,* at 10 (opinion concurring in judgment in part and dissenting in part). The concurrence finds no congressional power that would extend to the issuance or contents of passports. Including the power to regulate foreign commerce—even though passports facilitate the transportation of passengers, "a part of our commerce with foreign nations," *Henderson* v. *Mayor of New York,* 92 U. S. 259, 270 (1876). Including the power over naturalization—even though passports issued to citizens, like birth reports, "have the same force and effect as proof of United States citizenship as certificates of naturalization," 22 U. S. C. §2705. Including the power to enforce the Fourteenth Amendment's guarantee that "[a]ll persons born or naturalized in the United States . . . are citizens of the United States"—even though a passport provides evidence of citizenship and so helps enforce this guarantee abroad. Including the power to exclude persons from the territory of the United States, see Art. I, §9, cl. 1—even though passports are the principal means of identifying citizens entitled to entry. Including the powers under which Congress has restricted the ability of various people to leave the country (fugitives from justice, for example, see 18 U. S. C. §1073)—even though passports are the principal means of controlling exit. Including the power to "make all needful Rules and Regulations respecting the Territory or other Property

belonging to the United States," Art. IV, §3, cl. 2—even though "[a] passport remains at all times the property of the United States," 7 FAM §1317 (2013). The concurrence's stingy interpretation of the enumerated powers forgets that the Constitution does not "partake of the prolixity of a legal code," that "only its great outlines [are] marked, its important objects designated, and the minor ingredients which compose those objects [left to] be deduced from the nature of the objects themselves." *McCulloch*, 4 Wheat., at 407. It forgets, in other words, "that it is a *constitution* we are expounding." *Ibid.*

Defending Presidential primacy over passports, the concurrence says that the royal prerogative in England included the power to issue and control travel documents akin to the modern passport. *Ante,* at 10–11. Perhaps so, but that power was assuredly not exclusive. The Aliens Act 1793, for example, enacted almost contemporaneously with our Constitution, required an alien traveling within England to obtain "a passport from [a] mayor or . . . [a] justice of [the] peace," "in which passport shall be expressed the name and rank, occupation or description, of such alien." 33 Geo. III, ch. 4, §8, in 39 Eng. Stat. at Large 12. The Aliens Act 1798 prohibited aliens from leaving the country without "a passport . . . first obtained from one of his Majesty's principal secretaries of state," and instructed customs officers to mark, sign, and date passports before allowing their bearers to depart. 38 Geo. III, ch. 50, §8, in 41 Eng. Stat. at Large 684. These and similar laws discredit any claim that, in the "Anglo-American legal tradition," travel documents have "consistently been issued *and controlled* by the body exercising executive power," *ante,* at 10 (emphasis added).

Returning to this side of the Atlantic, the concurrence says that passports have a "historical pedigree uniquely associated with the President." *Ante,* at 28. This statement overlooks the reality that, until Congress restricted

the issuance of passports to the State Department in 1856, "passports were also issued by governors, mayors, and even . . . notaries public." Assn. of the Bar of the City of New York, Special Committee to Study Passport Procedures, Freedom to Travel 6 (1958). To be sure, early Presidents granted passports without express congressional authorization. *Ante,* at 11–12. But this point establishes Presidential authority over passports in the face of congressional *silence*, not Presidential authority in the face of congressional *opposition*. Early in the Republic's history, Congress made it a crime for a consul to "grant a passport or other paper certifying that any alien, knowing him or her to be such, is a citizen of the United States." §8, 2 Stat. 205 (1803). Closer to the Civil War, Congress expressly authorized the granting of passports, regulated passport fees, and prohibited the issuance of passports to foreign citizens. §23, 11 Stat. 60–61 (1856). Since then, Congress has made laws about eligibility to receive passports, the duration for which passports remain valid, and even the type of paper used to manufacture passports. 22 U. S. C. §§212, 217a; §617(b), 102 Stat. 1755. (The concurrence makes no attempt to explain how these laws were supported by congressional powers other than those it rejects in the present case.) This Court has held that the President may not curtail a citizen's travel by withholding a passport, *except on grounds approved by Congress. Kent* v. *Dulles*, 357 U. S. 116, 129 (1958). History and precedent thus refute any suggestion that the Constitution disables Congress from regulating the President's issuance and formulation of passports.

The concurrence adds that a passport "contains [a] communication directed at a foreign power." *Ante,* at 28. The "communication" in question is a message that traditionally appears in each passport (though no statute, to my knowledge, expressly requires its inclusion): "The Secretary of State of the United States of America hereby

requests all whom it may concern to permit the citizen/national of the United States named herein to pass without delay or hindrance and in case of need to give all lawful aid and protection." App. 22. I leave it to the reader to judge whether a request to "all whom it may concern" qualifies as a "communication directed at a foreign power." Even if it does, its presence does not affect §214(d)'s constitutionality. Requesting protection is only a "subordinate" function of a passport. *Kent, supra,* at 129. This subordinate function has never been thought to invalidate other laws regulating the contents of passports; why then would it invalidate this one?

That brings me, in analytic crescendo, to the concurrence's suggestion that *even if* Congress's enumerated powers otherwise encompass §214(d), and *even if* the President's power to regulate the contents of passports is not exclusive, the law might *still* violate the Constitution, because it "conflict[s]" with the President's passport policy. *Ante,* at 24. It turns the Constitution upside-down to suggest that in areas of shared authority, it is the executive policy that preempts the law, rather than the other way around. Congress *may* make laws necessary and proper for carrying into execution the President's powers, Art. I, §8, cl. 18, but the President *must* "take Care" that Congress's legislation "be faithfully executed," Art. II, §3. And Acts of Congress made in pursuance of the Constitution are the "supreme Law of the Land"; acts of the President (apart from treaties) are not. Art. VI, cl. 2. That is why Chief Justice Marshall was right to think that a law prohibiting the seizure of foreign ships trumped a military order requiring it. *Little* v. *Barreme*, 2 Cranch 170, 178–179 (1804). It is why Justice Jackson was right to think that a President who "takes measures incompatible with the expressed or implied will of Congress" may "rely only upon his own constitutional powers *minus any constitutional powers of Congress over the matter.*" *Youngstown*

*Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 637 (1952) (concurring opinion) (emphasis added). And it is why JUSTICE THOMAS is wrong to think that even if §214(d) operates in a field of shared authority the President might still prevail.

Whereas the Court's analysis threatens congressional power over foreign affairs with gradual erosion, the concurrence's approach shatters it in one stroke. The combination of (a) the concurrence's assertion of broad, unenumerated "residual powers" in the President, see *ante,* at 2–9; (b) its parsimonious interpretation of Congress's enumerated powers, see *ante*, at 13–17; and (c) its even more parsimonious interpretation of Congress's authority to enact laws "necessary and proper for carrying into Execution" the President's executive powers, see *ante*, at 17–20; produces (d) a presidency more reminiscent of George III than George Washington.

\*          \*          \*

International disputes about statehood and territory are neither rare nor obscure. Leading foreign debates during the 19th century concerned how the United States should respond to revolutions in Latin America, Texas, Mexico, Hawaii, Cuba. During the 20th century, attitudes toward Communist governments in Russia and China became conspicuous subjects of agitation. Disagreements about Taiwan, Kashmir, and Crimea remain prominent today. A President empowered to decide all questions relating to these matters, immune from laws embodying congressional disagreement with his position, would have uncontrolled mastery of a vast share of the Nation's foreign affairs.

That is not the chief magistrate under which the American People agreed to live when they adopted the national charter. They believed that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same

hands, . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47, p. 301 (Madison). For this reason, they did not entrust either the President or Congress with sole power to adopt uncontradictable policies about *any* subject—foreign-sovereignty disputes included. They instead gave each political department its own powers, and with that the freedom to contradict the other's policies. Under the Constitution they approved, Congress may require Zivotofsky's passport and birth report to record his birthplace as Israel, even if that requirement clashes with the President's preference for neutrality about the status of Jerusalem.

I dissent.